KITCHENS, Justice,
for the Court:
¶ 1. Troy Lofton alleges that he suffers from asbestosis as a result of exposure to the defendant’s product, Flosal, during the course of his employment on various oil and gas drilling rigs. Lofton filed suit on May 19, 2004, alleging two theories of product liability (design defect and inadequate warning), as well as claims for intentional and negligent infliction of emotional distress. Following a jury trial in the Second Judicial District of the Circuit Court of Jones County from March 29, 2010, through April 8, 2010, the jury returned a verdict in favor of Lofton on his claims of design defect and negligent infliction of emotional distress, with one hundred percent of the liability assigned to Chevron Phillips Chemical Company LP, successor-in-interest to ConocoPhillips Company, formerly known as Phillips Petroleum Company, and Phillips 66 Company, formerly doing business as Drilling Specialties Company (“CPChem”) and total damages in the amount of $15,200,000. CPChem’s motion for judgment notwithstanding the verdict and its motion for new trial and/or remittur were denied. Aggrieved, CPChem filed this appeal.
¶ 2. We reverse and remand for a new trial due to the trial court’s error in allowing Lofton’s counsel to read from drilling records that were not admitted into evidence during the cross-examination of CPChem’s expert pulmonologist, Dr. Robert Ross.
Facts and Procedural History
¶ 3. From 1963 through 1984, CPChem manufactured a product called Flosal, which contained 85-95% asbestos and was used as a drilling mud additive. The product was a viscosifier, and was used to increase the viscosity of (to thicken) drilling mud fluids. Drilling mud refers to the fluids used on an oil-drilling rig to lift cuttings — the dirt, rock or shale that had been drilled — from the bottom of the well bore to the surface. It then is pumped down the well bore via a drill pipe, through the drill bit, and back to the surface, carrying with it the cuttings.
¶ 4. Lofton worked on several oil and gas rigs from 1964 to 1983. He worked as a floorhand, mixing drilling mud and maintaining mud pumps, as well as a motorman, with responsibility for all the motors on the drilling rig. In these positions, Lofton worked with viscosifiers, including CPChem’s product, Flosal.
*1057 ¶5. Lofton’s medical records indicate that, in 1995, he was experiencing shortness of breath. A chest x-ray from 1995 revealed pulmonary fibrosis, or scarring of the lungs. A subsequent computed tomography (CT) scan of Lofton’s lungs from 1996 also indicated pulmonary fibrosis. Lofton testified at trial that he was not treated for the fibrosis at that time, nor was he made aware of its etiology. He sought treatment for his pulmonary symptoms in 2003 with Dr. Stogner, a pulmonol-ogist, who diagnosed Lofton with pulmonary fibrosis. In 2004, Dr. Stogner noted that Lofton likely was suffering of pneu-moconiosis, also know as asbestosis. After ruling out other etiologies, Dr. Stogner conclusively diagnosed Lofton with asbestosis in 2010. Asbestosis is a progressive disease caused by scar tissue in the lungs as a result of the body’s response to the presence of asbestos fibers in the lungs. An individual with asbestosis does not develop symptoms until about fifteen to thirty years after exposure.
¶ 6. At the time of trial, Lofton testified that he was on oxygen for eighteen to twenty hours a day. Dr. Stogner testified that, in the event of infection, Lofton would require oxygen twenty-four hours a day and would be at high risk of smothering. According to Dr. Stogner, Lofton’s condition will never improve. Dr. Stogner testified that Lofton’s life expectancy has been reduced.
¶ 7. The predecessor to this case, styled Lambert, et al. v. Phillips 66 Co., et al., Civil Action No.2004-85-CV5, was filed in Jones County, Mississippi, on May 19, 2004. In the original complaint, Lofton was one of twenty-three plaintiffs who had filed suit against various defendants, all of whom were manufacturers, distributors, and/or users of asbestos products to which claimants allegedly were exposed and by which they allegedly were injured. The circuit court adopted the report and recommendations of the appointed special master arid severed the claims on the basis of improper joinder, including Lofton’s claim.
¶ 8. On March 8, 2006, Lofton filed his individual third amended complaint in the circuit court of the Second Judicial District of Jones County, Mississippi.[1] The complaint alleged that the “Asbestos Defendants,” who were “in the business of manufacturing and distributing products containing asbestos” had “actual knowledge of the unreasonably dangerous propensities of asbestos.” Lofton alleged the defendants were strictly liable for “their products and for the failure to properly warn [Lofton] about the dangers of their product.” Lofton further alleged intentional and negligent infliction of emotional distress. He sought economic, noneco-nomic, and punitive damages. By the time of trial, the only remaining defendant was Chevron Phillips Chemical Company LP, successor-in-interest to ConocoPhillips *1058 Company formerly known as Phillips Petroleum Company, and Phillips 66 Company formerly doing business as Drilling Specialties Company (“CPChem”).
¶9. Following a two-week jury trial, with the Honorable Billy Joe Landrum presiding, the jury returned a verdict in favor of Lofton, assigning one hundred percent liability to CPChem and awarding total damages in the amount of $15,200,000, later adjusted by the trial court to $15,198,407.66, with $198,407.66 in compensatory damages and $15,000,000 in noneconomic damages.[2] CPChem’s motion for judgment notwithstanding the verdict and motion for new trial and/or remittitur were denied. Aggrieved, CPChem filed this appeal.
¶ 10. CPChem presents the following issues[3] for this Court’s review:
(1) Whether Lofton’s claims are time-barred by the three-year statute of limitations.
(2) Whether Lofton’s design-defect claim fails as a matter of law due to (a) a failure to overcome CPChem’s inherent-characteristic defense pursuant to Mississippi Code Section 11 — 1—68(b); (b) a failure to prove the product failed to function as expected; (c) a failure to prove a feasible design alternative for Flosal; (d) a failure to prove the frequency, regularity, and proximity of exposure to the product.
(3) Whether Lofton’s negligent-inflietion-of-emotional-distress claim is subsumed by the Mississippi Products Liability Act (MPLA), or in the alternative, whether his testimony was insufficient as a matter of law to establish his claim.
(4) Whether CPChem is entitled to a new trial because the trial court abused its discretion in (a) denying a change of venue, (b) admitting the testimony of Lofton’s industrial hygiene expert, (c) allowing Lofton’s counsel to use drilling records that were not admitted into evidence in the irrelevant and prejudicial cross-examination of CPChem’s pulmo-nologist.
(5) Whether CPChem is entitled to a new trial because the jury’s verdict is against the overwhelming weight of the evidence and demonstrates bias, prejudice, and passion due to the jury’s failure to allocate liability against responsible third parties.
(6) Alternatively, should the Court decline to reverse and render in favor of CPChem or to order a new trial, is CPChem entitled to a remittitur because the jury’s allocation of liability and damages was not supported by the evidence?
¶ 11. Additionally, CPChem has raised the issue of whether remarks made by the trial judge and Lofton’s counsel prejudiced the defense and resulted in bias on the part of the jury, such that a new trial is warranted. Given that this Court finds that a new trial is warranted on other grounds, we decline to address any specific remarks made during voir dire in the instant case.
Discussion
J. Whether Lofton’s claims are time-barred. by the three-year statute of limitations.
¶ 12. The threshold issue in the instant case is whether Lofton’s claims are *1059 time-barred by the three-year statute of limitations found in Mississippi Code Section 15-1-49 (Rev.2003). This Court applies a de novo standard of review to statutes of limitation. Lincoln Elec. Co. v. McLemore, 54 So.3d 833, 835 (Miss.2010) (citing Harris v. Darby, 17 So.3d 1076, 1078 (Miss.2009); Ellis v. Anderson Tully Co., 727 So.2d 716, 718 (Miss.1998)).
¶ 13. In cases of latent injury, such as the instant case, Section 15-1-49(2) provides:
In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.
Miss.Code Ann. § 15-1-49(2) (Rev.2003).
¶ 14. CPChem asserts that, under Section 15-1-49(2), the clock began running upon discovery of the injury to his lungs— when his doctors found pulmonary fibrosis in his lungs in 1995, or at the latest, 1996— not upon discovery of the injury’s cause (asbestos exposure). CPChem cites evidence from the record that Lofton’s medical records indicate that he was experiencing shortness of breath as early as 1995 and that a CT scan performed on Lofton’s lungs in 1995 exhibited evidence of fibrosis, as did a chest x-ray in 1996. Conversely, Lofton claims that he could not reasonably have known of his lung injury until he sought treatment from Dr. Stog-ner and was diagnosed with pulmonary fibrosis, or scarring of the lungs, in September 2003. Because he filed suit on May 19, 2004, Lofton argues that he was well within the three-year statute of limitations.
¶ 15. This Court has determined that the plain language of Mississippi Code Section 15-1-49(2) supports an interpretation “that the cause of action accrued upon discovery of the injury, not discovery of the injury and its cause.” Lincoln Elec. Co., 54 So.3d at 836 (citing Angle v. Koppers, Inc., 42 So.3d 1, 5 (Miss.2010)). Discovery of an injury “is an issue of fact to be decided by a jury when there is a genuine dispute.” Weathers v. Metropolitan Life Ins. Co., 14 So.3d 688, 692 (Miss.2009) (quoting Donald v. Amoco Prod. Co., 735 So.2d 161, 167 (Miss.1999)).
¶ 16. In the instant case, while Lofton began experiencing shortness of breath and exhibited scarring of the lungs as early as 1995, he did not seek medical treatment for his pulmonary concerns until he began seeing Dr. Stogner, a pulmonologist, in 2003 and was diagnosed with pulmonary fibrosis. According to Dr. Stog-ner, fibrosis in the lungs is associated with asbestosis, though it is not always indicative of asbestosis and has many other etiologies. A definitive diagnosis of asbestosis was not made until 2010. Moreover, according to Lofton’s testimony, he was seeking medical treatment for health concerns unrelated to his lungs in 1995 and 1996 and was not made aware of the fibrosis until Dr. Stogner diagnosed him in 2003. Accordingly, Lofton could not reasonably have known about his injury until he sought treatment in September 2003 for symptoms associated with his asbestosis and was diagnosed with pulmonary fibrosis. Since he filed suit in May 2004, he was well within the statute of limitations.
¶ 17. Given that this was a disputed issue of fact, the trial judge submitted the question of discovery to the jury, and instructed them as follows:
[T]he plaintiff is required to bring suit for his causes of action ... no later than three years after the cause of action accrued. In actions which involve latent injury or disease, the cause of action accrues when the plaintiff had discovered, or by reasonable diligence should have discovered, the injury. In this *1060 case, Mr. Lofton brought his intitial claims against the defendant on May 19, 2004.
If you determine that Mr. Lofton knew or by reasonable diligence should have known of his injury before May, 2001, then you must return a verdict for the defendant.
“A jury’s verdict is given great deference by this Court, and ‘conflicts of evidence presented at trial are to be resolved by the jury.’ ” Johnson v. St. Dominics-Jackson Mem’l Hosp. 967 So.2d 20, 23 (Miss.2007) (quoting Lift-All Co. v. Warner, 943 So.2d 12, 16 (Miss.2006); Blossman Gas, Inc. v. Shelter Mut. Gen. Ins. Co., 920 So.2d 422, 426 (Miss.2006); Venton v. Beckham, 845 So.2d 676, 687 (Miss.2003)). The jury clearly resolved this question of fact in Lofton’s favor, and this Court declines to disturb the jury’s determination.

II. Whether Lofton proved the elements of his design-defect claim.

¶ 18. CPChem argues that Lofton failed to prove the elements of his design-defect claim and asks this Court to reverse the judgment and render in its favor. The statutory elements of a Mississippi Products Liability Act (MPLA) claim are as follows:
The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
(i)1. The product was defective because it deviated in a material way from the manufacturer’s specifications or from otherwise identical units manufactured to the same manufacturing specifications, or
2. The product was defective because it failed to contain adequate warnings or instructions, or
3. The product was designed in a defective manner, or
4.The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and
(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and
(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought.
Miss.Code Ann. § ll-l-63(a) (Rev.2002). This Court has summarized these elements as follows:
The product’s design is unreasonably dangerous only if the plaintiff proves the required elements of a claim as set forth by the Act. In logical sequence, these elements [ ... ] are the following: (1) The danger presented by the product’s design was known or should have been known to the manufacturer (i.e., the danger was foreseeable); (2) the product failed to function as expected (as a result of a design characteristic); (3) an alternative design existed that would not impair the product’s usefulness or desirability; and (4) the alternative design would have to a reasonable probability prevented the harm.
Williams v. Bennett, 921 So.2d 1269, 1274 (Miss.2006).

A. Whether the inherent characteristic defense applies.

¶ 19. The MPLA protects defendants from liability where an inherent characteristic defense applies:
A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially *1061 compromising the product’s usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community.
Miss.Code Ann. § 11 — 1—68(b) (Rev.2002) (emphasis added).
¶ 20. CPChem argues that removal of asbestos from Flosal would eliminate its usefulness and desirability, given that Flo-sal contained 85-95% chrysotile asbestos. Lofton asserts that it is not the presence of asbestos alone that makes Flosal unreasonably dangerous; it is the fact that the product in ordinary use produced breathable asbestos fibers in the presence of workers. Moreover, Lofton’s oilfield expert, Edward Ziegler, testified that asbestos is not an inherent characteristic of a viscosifier.
¶ 21. The second prong of Lofton’s argument is that, under the statute, the dangers from the product must be “recognized by the ordinary person with the ordinary knowledge common to the community” for the inherent characteristic defense to apply, and that the dangers of asbestos were unknown for much of the time period Flosal was on the market. Miss.Code Ann. § 11 — 1—63(b) (Rev.2002). Conflicting testimony was presented as to whether an ordinary person with ordinary knowledge common to the community was aware of the dangers of asbestos during the time Flosal was first marketed. Edward Ziegler testified that the consumers and users of Flosal, particularly the average worker in the field, were unaware of the health hazards associated with it. He testified that he was personally unaware of the health hazards until 1979. Lofton testified that he did not know of dangers at the time he was exposed to the product until the 1980s.
¶ 22. CPChem cites testimony from Lofton’s expert, Dr. Arnold Brody, who indicated that chrysotile asbestos was generally known to be toxic by 1963. Dr. Edwin Holstein, an expert for the defense, testified that the medical community was generally aware of asbestos’s toxicity by 1964. It is noteworthy to highlight that Dr. Holstein’s testimony centered on the medical community’s knowledge of asbestos, not that of the ordinary person with ordinary knowledge.
¶ 23. Pursuant to Mississippi Code Section ll-l-63(b), the “inherent characteristics defense ... is just that — a defense that must be pled and proven, rather than an outright bar.” R.J. Reynolds Tobacco Co. v. King, 921 So.2d 268, 272 (Miss.2005). “The burden rests upon the defendant, not the plaintiff, to prevail on an affirmative defense.” Id. (citing Pearl Pub. Sch. Dist. v. Groner, 784 So.2d 911, 916 (Miss.2001)). Having found in favor of Lofton on his design-defect claim under the MPLA, the jury obviously found that CPChem had failed to prove its inherent characteristic defense. “When evidence is conflicting, we defer to the jury’s determination of the credibility of witnesses and the weight of their testimony.” Bickham v. Grant 861 So.2d 299, 307 (Miss.2003). This assignment of error is without merit.

B. Whether Flosal failed to function as expected and whether there was evidence of a feasible design alternative.

¶ 24. CPChem argues that the product did not fail to function as expected because it was a highly effective drilling mud additive. Furthermore, CPChem’s position is that when Flosal left its control, no other asbestos viscosifier was formulated, so as to not generate breathable fibers during use, and the dangers of asbestos were well known. CPChem further avers that it was Lofton’s misuse of their product that resulted in injury, since, as of 1963, its product was packaged with warn *1062 ings that included: a warning that the product contained asbestos, that adequate protective devices were needed to prevent inhalation, that users should avoid creating dust, and that inhalation of asbestos might cause serious bodily injury. Finally, CPChem argues that Lofton presented no evidence or empirical data to demonstrate how Flosal could be reengineered or redesigned to eliminate the production of breathable asbestos fibers during ordinary use; thus, according to CPChem, Lofton’s claim fails as a matter of law.
¶25. Lofton counters that CPChem’s products were intended to perform their function without causing asbestos-related diseases. To this end, Lofton cites his testimony that he had no expectation that use of the product would result in injury. Lofton’s expert Edward Zeigler testified that the average user had no expectation that the product would result in injury.
¶ 26. Moreover, Lofton argues that he presented evidence that viscosifiers and hole-sweeping materials existed between 1964 and 1985 that did not contain asbestos. Accordingly, Lofton argues that the jury heard ample evidence that a feasible design alternative existed — namely that nonasbestos drilling mud viscosifiers were readily available in the oil and gas industry as opposed to asbestos-containing viscosifi-ers.
¶ 27. Mississippi Code Section 11 — 1—63(f) (Rev.2002) provides as follows:
In any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)S of this section, the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the conti’ol of the manufacturer or seller: (i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and
(ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.
(Emphasis added.) “If an alternative design could have been practically adopted at the time of sale, and if the omission of such an alternative design rendered the product not reasonably safe, then a design is defective.” Williams v. Bennett, 921 So.2d 1269, 1275 (Miss.2006). Admissions by CPChem at trial included the fact that nonasbestos viscosifiers existed during each year from 1964 to 1985 for use on drilling rigs. Edward Ziegler testified that, between the years 1964 and 1984, nonasbestos viscosifiers were available with similar characteristics and purposes as Flosal — products containing nontoxic ingredients such as clay, lime, and polymers. The deposition of CPChem’s expert J.C. Floyd, which was read to the jury during the trial, included testimony that, before and after Flosal was on the market, nonas-bestos products existed for increasing viscosity.
¶ 28. Given that the evidence showed that alternative vicosifiers were available which did not contain asbestos, we conclude that Lofton sufficiently adduced proof of this element of his design defect claim.

C. Whether Lofton proved the requisite “frequency, proximity, and regularity” standard under Gorman-Rupp.

¶ 29. CPChem argues that Lofton did produce sufficient evidence to meet the threshold “frequency, regularity, *1063 and proximity” test adopted by this Court in Gorman-Rupp Co. v. Hall, 908 So.2d 749, 757 (Miss.2005). “In asbestos litigation in Mississippi, the proper test to be used is the frequency, regularity, and proximity standard to show product identification of the defendants’ actual products, exposure of the plaintiffs to those products, and proximate causation as to the injuries suffered by the plaintiffs.” Monsanto Co. v. Hall, 912 So.2d 134, 137 (Miss.2005). Lofton argues that he had twenty years of frequent exposure in close proximity to the asbestos fibers of CPChem’s product and has met the “frequency, regularity and proximity” standard from Gor-man-Rupp.
¶ 30. ■ Lofton’s testimony is replete with references to his having had frequent contact with Flosal in the close confines of an unventilated mud room. Lofton testified that, beginning in 1964 at his first job with Four States Drilling in Jones County, he mixed CPChem’s products, Flosal and Vis-quik,[4] into drilling mud in a mud house without ventilation and working without a mask. In mixing drilling mud, five to fifteen sacks (250-750 pounds) of asbestos drilling mud additives generally were used.[5] When a loss of circulation occurred, 50 to 150 bags (2,500-7,500 pounds) were used to correct the problems. He estimated that, in his entire career, he had used “thousands” of bags of either Flosal or Visquick. In a single well, he estimated he might use on average 200 to 250 bags of CPChem’s product. Moreover, Dr. Edwin Holstein, an expert in internal medicine and asbestos-related .disease, opined based on Lofton’s social security work records, testimony, and Holstein’s own expert knowledge of similar work environments, that Lofton had “sufficient exposure to asbestos from [Fjlosal to cause, or at. least to contribute to the causation of his asbestosis.”
¶ 31. We find that there was sufficient evidence of frequency, regularity, and proximity to Flosal to establish Lofton’s claim. Thus, this argument is without merit.
¶ 32. Given that Lofton would have been entitled to both economic and noneco-nomic damages under either the MPLA or a common law theory of negligence, and given that we have found that he met his evidentiary burden under MPLA, it is unnecessary for this Court to reach the issue of whether Lofton’s negligence claim was subsumed under MPLA or whether Lofton failed to prove his claim of negligent infliction of emotional distress.

III. Whether the trial court erred in failing to grant a change of venue, or alternativelg, whether voir dire served to eliminate ang potential bias in the venire.

¶ 33. CPChem argues that venue was improper and it was entitled to a change of venue. Conversely, Lofton asserts that CPChem was able to obtain a fair trial in the Second Judicial District of Jones County, given that the trial judge increased the venire by one hundred additional members and given that CPChem had obtained a jury verdict in its favor in another Jones County case, which was tried just months prior to the instant case.
¶ 34. Mississippi Code Section 11-11-51 (Rev.2004), provides:
When either party to any civil action in the circuit court shall desire to change the venue, he shall present to the court, or the judge of the district, a petition setting forth under oath that he has good reason to believe, and does believe *1064 that, from the undue influence of the adverse party, prejudice existing in the public mind, or for some other sufficient cause to be stated in the petition, he cannot obtain a fair and impartial trial in the county where the action is pending, and that the application is made as soon as convenient after being advised of such undue influence, prejudice, or other cause, and not to delay the trial or to vex or harass the adverse party.
“[This Court has] described a plaintiffs ability to choose a forum as a ‘right’: ‘Of right, the plaintiff selects among the permissible venues and his choice must be sustained unless in the end there is no credible evidence supporting the factual basis for the claim of venue.’ ” Bayer Corp. v. Reed, 932 So.2d 786, 790 (Miss.2006) (quoting Flight Line, Inc. v. Tanksley, 608 So.2d 1149, 1155 (Miss.1992)).
The decision to deny or grant a motion for a change of venue lies within the discretion of the trial court. Beech v. Leaf River Forest Prods., Inc., 691 So.2d 446, 448 (Miss.1997). We will not overturn that decision unless the trial court abuses its discretion. Id. It is the plaintiffs prerogative to decide where, among permissible venues, to sue the defendant. Forrest County Gen. Hosp. v. Conway, 700 So.2d 324, 826 (Miss.1997). Therefore, absent weighty reasons, a plaintiffs choice of forum should not be disturbed. Purdue Pharma, L.P. v. Estate of Heffner, 904 So.2d 100, 102 (Miss.2004).
Bayer Corp., 932 So.2d at 788-89.
¶ 35. This Court discussed factors that courts look to in deciding a change-of-venue motion in Janssen Pharmaceutica, Inc. v. Bailey, 878 So.2d 31, 49-53 (Miss.2004). CPChem argues those factors weigh in its favor, based on the following: (1) community connections to the subject matter of the litigation, including pending asbestos drilling mud lawsuits filed in Jones County against CPChem, (2) negative publicity in Jones County, including direct mailing of attorney advertising and solicitations for asbestos claimants, (3) prominent local public officials and their family members prosecuting their own asbestos lawsuits. See Bailey, 878 So.2d at 52-53. See also Beech v. Leaf River Forest Products, Inc., 691 So.2d 446, 450 (Miss.1997) (“The change of venue was reasonable in light of the extensive pretrial publicity and the citizen bias against the defendants created by the number of George County residents who have brought similar dioxin cases against the defendants.”).
¶ 36. CPChem argues there are significant connections between the residents of Jones County and the subject matter of the litigation. CPChem claims that 21,617 plaintiffs have filed asbestos cases in Jones County, with more than 17,000 of those cases having been filed against Union Carbide, a former defendant in the instant case. Furthermore, CPChem claims that more than 3,510 asbestos lawsuits were filed in Jones County during just the six years preceding this trial. CPChem avers that Lofton’s counsel has filed more than 700 drilling mud asbestos claims, with sixty-four percent of those filed in Jones County. Lofton’s counsel allegedly had filed 458 asbestos-related claims in Jones County. To the contrary, Lofton points to the fact that asbestos drilling mud causes of action are pending in Jones County because many of the plaintiffs in those cases were exposed to asbestos in Jones County. Moreover, Lofton avers that the principal places of business for drilling and oilfield defendants are located in Jones County. Lofton argues that CPChem fails to establish how many plaintiffs in asbestos-related suits are Jones County residents eligible for jury duty.
¶ 37. CPChem’s failure to provide evidence in support of its figures, as well as *1065 its failure to provide evidence of how many Jones County residents have similar causes of action pending, distinguishes the instant petition for change of venue from the defendants’ petition for change of venue in Beech v. Leaf River Forest Products, Inc., 691 So.2d 446 (Miss.1997). In Beech, 691 So.2d at 447-48, landowners filed suit in George County Circuit Court against Leaf River Forest Products, Inc., for alleged contamination of the Leaf and Pasca-goula Rivers with high levels of dioxin. A change of venue was granted due to the number of community residents involved in similar causes of action and the substantial publicity generated by the case. Id. at 448. This Court found no error on the part of the trial court in granting a change of venue where “defendants presented sufficient evidence in the form of affidavits, depositions, newspaper articles, videotapes of news stories, and other exhibits to support their petition for change of venue.” Id. at 450. In so doing, this Court found that the evidence in support of the defendants’ motion indicated that “of the 8,909 residents of George County eligible for jury duty, 750 were plaintiffs in dioxin cases brought against the defendants in this case.” Id.
¶ 38. The figures cited by CPChem of the high number of pending asbestos-related causes of action in Jones County are not supported by the exhibits in the record. The figures come solely from the motion to transfer venue filed by Union Carbide, a former defendant in the instant case, in which CPChem joined. While exhibits to the motion include similar, asbestos-related complaints that have been filed in the Second Judicial District of Jones County involving multiple plaintiffs, nothing in the record establishes whether some, all or none of these plaintiffs were Jones County residents eligible for jury duty, and thus, whether they potentially could contaminate the jury pool in the instant case. Without an evidentiary basis, we decline to hold that the trial court abused its discretion in failing to grant the motion to transfer venue based on this factor.
¶ 39. Furthermore, CPChem cites evidence that Lofton’s counsel advertised asbestos-related illness screenings for former oil-field workers, which were conducted in Hattiesburg and Jackson. Lofton distinguishes this factor from the pretrial publicity in Bailey, in that the potential jury pool in Bailey had been exposed to television advertising, not targeted, mailed solicitations. See Bailey, 878 So.2d at 52. CPChem provided the trial court with no direct evidence of how many Jones County residents received the mailed solicitation, nor did CPChem provide any evidence regarding the number of Jones County residents who attended screenings for asbestos-related diseases. During voir dire, the venire members were questioned about the mailers, and each panel member denied having received one. Based on the foregoing facts, we cannot find that the trial court abused its discretion in not granting the change of venue due to pretrial publicity.
¶ 40. CPChem asserts that Jones County public officials and their family members[6] have filed asbestos lawsuits, including a justice court judge,[7] a city coun- *1066 oilman,[8] and the city fire department chief.[9] Although the names of these supposed public figures appear on the complaints attached as exhibits to Union Carbide’s motion to transfer venue, there is nothing in the record conclusively establishing what, if any, public office has been held by these plaintiffs and/or the family members of plaintiffs, nor was the trial court asked to take judicial notice of the offices held by any of the plaintiffs.
¶ 41. Finally, CPChem argues that the pretrial juror questionnaires indicated that members of the venire and/or their family members had been employed in the drilling industry, had been employed by Masonite International Corporation of Laurel, Mississippi,[10] or had connections to asbestos litigation. Moreover, CPChem maintains that the pretrial juror questionnaires revealed that members of the venire or members of their families had received advertisements regarding exposure to asbestos or screening for asbestosis. Lofton counters that voir dire conducted by the trial court and counsel for both parties effectively served to eliminate any bias in the jury pool.
¶ 42. The record clearly shows that the trial judge devoted an extensive amount of time to questioning the venire members regarding their responses on the jury questionnaire regarding asbestos claims.
In general, a voir dire is presumed sufficient to ensure a fair and impartial jury. To overcome this presumption, a party must present evidence indicating that the jury was not fair and impartial and show that prejudice resulted from the circuit court’s handling of the voir dire.
Ross v. State, 954 So.2d at 988.[11] The trial judge dismissed all venire members who expressed that they personally had been involved in an asbestos case. He dismissed all venire members who had family members currently receiving benefits from an asbestos claim. For each venire member who had a family member that had received some benefit from an asbestos claim in the past, but had never directly benefitted from the claim himself, the trial judge questioned each as to his or her ability to be impartial. Each indicated that he or she could be fair and impartial. Moreover, the trial judge questioned members of the venire about whether they or members of their families had been around drilling mud. He dismissed each venire member who answered in the affirmative. Finally, defense counsel was able to question the venire members on whether they had ever worked around or been exposed to asbestos. Defense counsel was admonished by the trial judge for asking redundant questions that the trial judge had previously asked of the venire about family members and asbestos claims. Given that these questions already had been asked by the trial court, we cannot say this resulted in any error, as in voir dire, “the attorney will question the entire venire only on matters not inquired into by the court.” URCCC 3.05. Based on the responses of *1067 the venire members who were retained, the record does not reflect any bias based on an association with an asbestos claim.
¶ 48. For all of the forgoing reasons, CPChem has failed to show that a fair, impartial jury could not be had in the Second Judicial District of Jones County. Thus, the trial court did not abuse its discretion by denying CPChem’s motion to change venue.
IV. Whether the trial court should have excluded Lofton’s industrial hygiene expert under Daubert, McLemore, and Mississippi Rule of Evidence 702.
¶44. CPChem claims that the trial court failed to consider the factors of relevance and reliability when it allowed CPChem’s industrial hygiene expert Kenneth Cohen’s testimony from another trial to be read into evidence. Moreover, CPChem asserts that Cohen does not have the proper credentials to qualify as an expert in industrial hygiene and that his testimony was not based on any reliable methodology. According to CPChem, Cohen’s testimony misled and confused the jury. CPChem claims that the testimony is not relevant in this case because Cohen’s testimony from the other trial [12]did not concern a CPChem product, did not pertain to asbestosis, did not pertain to Lof-ton, and did not pertain to any of Lofton’s previous work environments.
¶ 45. To the contrary, Lofton maintains that Cohen has a doctorate in occupational health and has various credentials as a professional engineer in occupational safety and industrial health. Lofton characterizes the prior testimony as evidence of general causation and an opinion on CPChem’s site-testing procedures.
¶ 46. “[T]he admission of expert testimony is within the sound discretion of the trial judge.” Mississippi Transp. Cornm’n v. McLemore, 863 So.2d 31, 34 (Miss.2003). Rule 702 of the Mississippi Rules of Evidence states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 47. This Court in McLemore, 863 So.2d at 35, adopted the federal standard for the admissibility of expert ■witness testimony announced in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as modified in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). “The focus of this analysis ‘must be solely on principles and methodology, not on the conclusions they generate.’ ” McLemore, 863 So.2d at 36-37 (quoting Daubert, 509 U.S. at 595, 113 S.Ct. 2786, 125 L.Ed.2d 469). The Supreme Court in Daubert adopted a nonex-haustive list of reliability factors for determining the admissibility of expert witness testimony: whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique’s oper *1068 ation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. McLemore, 863 So.2d at 37 (citing Daubert, 509 U.S. at 592-94, 113 S.Ct. 2786, 125 L.Ed.2d 469).
¶ 48. Upon the recommendation of the special master in the instant case, the trial court admitted Cohen’s deposition testimony as that of an expert in industrial hygiene. Cohen has published asbestos-related studies in peer-reviewed journals. Cohen testified regarding federal standards for monitoring asbestos fiber levels and opined that the methods utilized by CPChem were inconsistent with industry standards. He testified that, from an industrial hygiene perspective, there is a correlation between substantial asbestos exposure and disease.
¶49. Accordingly, this testimony, in regard to industry safety standards, was relevant and assisted the jury in understanding the evidence. However, not all of the testimony pertained to the instant case, as Cohen was testifying in another trial and applying his expertise to another plaintiff and an altogether different set of facts. Rule 702 requires that “the witness has applied the principles and methods reliably to the facts.” Upon remand for a new trial, all testimony that does not pertain to general industry standards, that does not pertain to a CPChem product, that does not pertain to the general causation of asbestosis, and that does not pertain to any of Lofton’s previous work environments, should be excluded, as that evidence does not meet requisite evi-dentiary standards and should be excluded. See Miss. R. Evid. 401, 403.
¶ 50. Finally, CPChem characterizes Cohen as a “hired gun,” given that he has testified as an expert in more than five hundred trials, including, among other subjects, rape cases, amputation cases, and machine guarding cases. “The weight and credibility of expert testimony are matters for determination by the trier of fact.” City of Jackson v. Law, 65 So.3d 821, 832 (Miss.2011) (quoting Hubbard v. McDonald’s Corp., 41 So.3d 670, 675 (Miss.2010)). Upon remand, the jury is well within its purview to assign whatever weight it deems appropriate to the fact that Cohen has testified in hundreds of other trials on a number of subject matters.

V. Whether the trial court erred in its treatment of Plaintiff’s Exhibit 950.

¶ 51. CPChem claims that Lofton’s cross-examination of Dr. Robert Ross using Plaintiffs Exhibit 950, comprised of historical drilling records on the use of asbestos viscosifiers in drilling rigs in Mississippi, was irrelevant pursuant to Mississippi Rule of Evidence 401, as well as prejudicial to its defense, given that the drilling records did not correspond to Lof-ton’s work sites or the use of CPChem’s product. CPChem claims this misled and confused the jury into believing that Exhibit 950 documented use of Flosal at drill sites where Lofton worked. Additionally, CPChem alleges that Lofton’s counsel “testified” as to the contents of Exhibit 950, even though it had not been admitted into evidence in Lofton’s case-in-chief and Dr. Ross was unfamiliar with the contents of the records.
¶ 52. Lofton counters that, under Mississippi Rule of Evidence 611(b), he was entitled to cross-examine the witness in a manner not “limited to the subject matter of the direct examination and matters affecting the credibility of the witness.” Lofton cites evidence that Dr. Ross authored a medical treatise advising physicians that they must obtain an occupational history of asbestos exposure before a diagnosis of an asbestos-related disease can be made. Furthermore, Lofton states *1069 that, since Dr. Ross opined as to Lofton’s medical condition, yet had never seen Lof-ton’s work records, counsel for Lofton was permitted to impeach Dr. Ross’s opinion testimony with Lofton’s employment history and the use of asbestos products by Lofton’s employer.
¶53. On cross-examination, Dr. Ross, when asked by Lofton’s counsel, indicated that he had not reviewed the exhibit in question, which contained reports of the amounts of asbestos drilling additives used in wells in Mississippi between 1964 and 1983. Over the objection by CPChem, counsel asked, “[I]f these documents indicate that over 500 tons of asbestos drilling mud additives were used in Mississippi during that period, you couldn’t dispute that, could you?” Counsel then proceeded in the context of cross-examination to read into evidence the contents of Exhibit 950, including that one of Lofton’s employers recorded that, in a six-week period, about 1,750 pounds of Flosal had been used. At another point of cross-examination, Lof-ton’s counsel, reading from one of the reports, stated, “[TJhis is Mr. Lofton’s employer. And [at] this [rig] there are 42 bags [of mud materials] used, 2,100 pounds, more than a ton?” Again, the defense objected because Lofton’s counsel was simply reading from the document, but the objection was overruled.
¶ 54. Lofton’s counsel continued on, reading from the documents and eventually stating that “during the time Mr. Lofton worked in the oil and gas field for his employers as represented by these well reports, you come up with, just these reports 111,000 pounds of asbestos drilling mud additives.” The witness throughout this line of “questioning” kept repeating that he had not reviewed these documents.
¶ 55. The introduction of this exhibit and the trial court’s having allowed the plaintiff’s counsel to read it into evidence was an abuse of discretion. First, the evidence was irrelevant under Rule 401, given that the well reports (although some were authored by Lofton’s employers) failed to identify any particular well on which Lofton had worked. At one point, the defense objected on the basis that plaintiffs counsel was reading from a document from a time period when Lofton was not even employed by that particular drilling company, yet the trial court continued to overrule the objections. Moreover, these reports included all asbestos mud additives and were not necessarily specific to Flosal or other products manufactured by CPChem.
¶ 56. This line of cross-examination appears to be an attempt by the plaintiffs counsel to imply that, during Lofton’s career, he had been potentially been exposed to as much as 111,000 pounds of asbestos mud additives. In that sense, it was highly prejudicial to CPChem, and grossly overestimated, given that there was no way to identify from the evidence how many bags of Flosal Lofton specifically had been used. The admission of Exhibit 950 and this manner of testifying by plaintiffs counsel should have been excluded, because any probative value it may have had was “substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading” the jury. Miss. R. Evid. 403. Accordingly, we find it necessary to reverse and remand for a new trial.

VI. Whether the jury’s verdict was contrary to the overwhelminy weiyht of the evidence and demonstrates the jurors’ bias, prejudice, and passion.

¶ 57. CPChem argues that Lofton’s employers had a duty to monitor drill sites and implement measures to protect Lofton from asbestos exposure. CPChem maintains that Lofton would never have experienced the exposure he alleged if his em *1070 ployers had furnished necessary protective equipment. CPChem argues that it demonstrated at trial the negligence of drilling mud service companies who delivered asbestos viscosifíers to drill sites where Lof-ton worked, whose recommendations included the amount of asbestos viscosifier to use, as well as that of the well operators who had to agree to the use of asbestos at drilling sites where Lofton worked. Finally, CPChem points to the jury’s failure to allocate liability to the manufacturers and distributors of other asbestos products, e.g., Yisbestos, SuperVisbestos, to which Lofton also was exposed. CPChem believes that the jury’s allocation of all liability against CPChem is illogical, contradictory, and against the overwhelming weight of the evidence and asks this Court to grant a new trial.
¶ 58. “A new trial may be granted where the verdict is against the overwhelming weight of the evidence, or when the jury has been confused by faulty instructions, or when the jury has departed from its oath and its verdict is a result of bias, passion, and prejudice.” Coho Resources, Inc. v. Chapman, 913 So.2d 899, 908 (Miss.2005). The jury was properly instructed that it could apportion liability to the third party, “empty chair” defendants. However, given that we have found that highly prejudicial, irrelevant evidence was before the jury, it is logical to conclude that this prejudicial evidence could have swayed the jury and resulted in the apportionment of liability falling squarely and exclusively on CPChem. As previously determined, a new trial is warranted.

CONCLUSION

¶ 59. Because Exhibit 950 was read into evidence by and through Lofton’s counsel, and because it was irrelevant and highly prejudicial to CPChem, we reverse the judgment of the Jones County Circuit Court and remand for a new trial consistent with this opinion. In particular, irrelevant portions of Cohen’s expert testimony should be excluded in a new trial. All other assignments of error raised by CPChem are without merit.
¶ 60. REVERSED AND REMANDED.
WALLER, C.J., CARLSON AND DICKINSON, P.JJ., LAMAR, CHANDLER AND KING, JJ., CONCUR. RANDOLPH AND PIERCE, JJ., NOT PARTICIPATING.

. The original defendants included Phillips 66 Company, individually and d/b/a Drilling Specialties Company; Phillips Petroleum Company, individually and d/b/a Phillips 66 Company and/or d/b/a/ Drilling Specialties Company; Drilling Specialties Company, LLC a/k/a DSC Drilling Specialties Company, LLC; Conoco Phillips Company, individually and as successor to Phillips 66 Company; Phillips Petroleum Company and Drilling Specialties Company; Montello, Inc.; Union Carbide Corporation; Dow Chemical Company, individually and as successor to Union Carbide Corporation; Baker-Hughes Oilfield Operations, Inc., individually and as successor to Baker Hughes Inteq, Inc. a/k/a Baker Hughes Inteq Drilling Fluids, Inc., Baker International, Inc., Baker Oil Tools, Inc., Mil-park, Inc., Newpark Drilling Fluids, Inc., Laurel Mud and Chemical Corp., Milchem, Inc. f/k/a Milwhite Mud Sales Company, Hughes Drilling Fluid, Inc., Obi-Hughes, Inc. f/k/a Oil Base, Inc.; Baker Hughes, Incorporated; Oilfield Service and Supply Company, Inc.; Mississippi Mud, Inc., John Does 1 through 5, and John Does 6 through 15.

. CPChem moved the trial court to reduce the noneconomic damages pursuant to Mississippi Code Section 1 l~l-60(2)(b); however, because Section 1 l-l-60(2)(b) was not effective until September 1, 2004, and Lofton’s suit was filed on May 19, 2004, the trial court determined that the verdict was not subject to the statutory cap. This issue has not been raised on appeal. See Miss.Code Ann. §11-l-60(2)(b) (Supp.2011).

. For the sake of brevity, CPChem’s issues have been restated and reorganized throughout the analysis.

. Flosal had been rebranded by distributors.

. Lofton’s testimony was that CPChem’s product was not the only asbestos viscosifier to which he was exposed.

. CPChem names George Carmichael and Willie Lavonne Evans as members of the Laurel City Council and immediate family members of asbestos plaintiffs. Additionally, Lula Cooley is alleged to be an employee of the City of Laurel Planning and Development Department and an immediate family member of an asbestos plaintiff.

. David Lyons, a plaintiff found in a complaint which Union Carbide attached as an exhibit, to its motion to change venue, is alleged to be a justice court judge in Jones County.

. CPChem asserts that Manual L. Jones is a city councilman in Laurel.

. Jimmie E. Bunch is identified by CPChem as the Laurel City Fire Chief.

. The Masonite International Corporation has been a defendant in numerous asbestos-related cases.

. As previously determined, the record does not support CPChem’s claims of extensive pretrial publicity, such that voir dire would be ineffective in eliminating juror bias. See Bailey, 878 So.2d at 52 ("This Court has previously recognized the ineffectiveness of voir dire in detecting juror bias created by pretrial publicity.") (quoting Beech v. Leaf River Forest Prods., Inc., 691 So.2d 446, 450 (Miss.1997); Fisher v. State, 481 So.2d 203, 220-21 (Miss.1985)).

. The expert testified in Smith v. Phillips 66 Company, et al., Cause No. 2006-212 (May 20, 2009).