# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-01013-SCT

*HYUNDAI MOTOR AMERICA AND HYUNDAI
MOTOR COMPANY*

*v.*

*JOYCE D. HUTTON AND DEREK BELL*


| | |
|---|---|
| DATE OF JUDGMENT: | 11/03/2014 |
| TRIAL JUDGE: | HON. JOHNNIE E. WALLS, JR. |
| TRIAL COURT ATTORNEYS: | MICHAEL ALFRED JACOB, II |
| | WILLIAM SHATTUCK ADAMS, JR. |
| | S. DAVID NORQUIST |
| | WARREN BARKSDALE BELL |
| | KEITH W. McDANIEL |
| | ROBERT WILLIAM MAXWELL |
| | MICHAEL B. ALKER |
| | DOMINIC JOHN OVELLA |
| | SEAN PATRICK MOUNT |
| | DAVID BISHOP ESTES |
| | SARA BAILEY RUSSO |
| | ROBERT D. FORD |
| | ANDREW M. W. WESTERFIELD |
| | DANA J. SWAN |
| | WILLIAM O. LUCKETT, JR. |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | J. COLLINS WOHNER, JR. |
| | ROBERT WILLIAM MAXWELL |
| | THOMAS N. VANDERFORD, JR. |
| | ZACHARY A. MADONIA |
| | WILLIAM O. LUCKETT, JR. |
| | MICHAEL JAMES BENTLEY |
| ATTORNEYS FOR APPELLEES: | RALPH EDWIN CHAPMAN |
| | ANDREW M. W. WESTERFIELD |
| | CHRISTOPHER NICKLAUS BAILEY |
| | DANA J. SWAN |
| | S. DAVID NORQUIST |
| | WARREN BARKSDALE BELL |

NATURE OF THE CASE:          CIVIL - PERSONAL INJURY
DISPOSITION:                      REVERSED AND RENDERED - 09/16/2021
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**RANDOLPH, CHIEF JUSTICE, FOR THE COURT:**

¶1.     The instant case arises from a single-car accident involving a 2005 Santa Fe Hyundai, which had been rented by Joyce Hutton and was being driven by Derek Bell on U.S. Highway 61. It was reported to the police officer that the car drifted into the median, and Bell lost control. Both Bell and Hutton were injured. Hutton filed suit against Hyundai Motor America, Hyundai Motor Company, and Bell, and Bell filed a cross-claim against Hyundai. Hutton settled her injury claims against Bell prior to trial. Bell and Hutton proceeded against Hyundai. At trial, both alleged the car was defectively designed.

¶2.     Plaintiffs' theory was that the Hyundai was defectively designed due to an exposed, unprotected component of the anti-lock braking system (ABS).  Plaintiffs asserted that an unseen and never-discovered object of unknown elements and composition struck a component part, dislodging an ABS tone ring *temporarily*, which caused the vehicle's computer to send erratic braking signals. The size, shape, and component elements of the phantom object are unknown. Plaintiffs further asserted that the alleged erratic signals in turn caused the ABS computer to assume that the front right wheel was not turning, which in turn caused braking to occur on the front left side. The alleged one-sided braking caused Bell to lose control before the vehicle overturned multiple times.

¶3.     Hyundai countered that the cause of the accident was that Bell over-steered to the left

2

lane and lost control of the vehicle while passing a Wonder Bread delivery truck. Hyundai offered that a phantom object did not cause the accident. The phantom object was never seen, found, or identified by Bell, Hutton, the state trooper who investigated the accident, eyewitnesses to the accident, Plaintiffs' witnesses (experts or otherwise), or anyone else. Further, Hyundai argued that, assuming arguendo that Plaintiffs' multiple-chain-reaction theory were possible, the trajectory of any object would have occurred within *fifty milliseconds*—a scientific, physical impossibility.

¶4.    After a two-week trial, the jury returned a verdict for Plaintiffs—$193,000 for Hutton and $2 million[1] for Bell. Hyundai appeals, claiming a number of errors by the trial court. This Court finds that reversible error was committed in the trial court. The verdict is reversed. Judgment is rendered in favor of Hyundai.

**FACTS AND PROCEDURAL HISTORY**

¶5.    On December 17, 2005, Bell and Hutton were traveling south on U.S. Highway 61 near Boyle, Mississippi.  Bell was driving, and Hutton was seated in the front passenger seat of a 2005 Hyundai Santa Fe, rented by Hutton from Enterprise Rent-A-Car[2] the previous day.

¶6.    On the day of the accident, neither Bell nor Hutton reported to the investigating officer that they heard any noises or ran over any object. At trial, Plaintiffs offered that they suddenly heard a loud noise outside of the vehicle.  At first in the trial, Bell testified that not only did he hear a loud noise but also that he applied the brakes before the car jerked left.

---

[1] The $2 million verdict was later remitted to $1,676,361.

[2] Enterprise was named as a Defendant in the original complaint filed by Hutton.

3

Yet, on cross-examination, Bell testified that he did not apply the brakes until *after* the vehicle pulled left.[3] All acknowledged that Bell lost control of the vehicle while passing a bread truck, drove onto the median, and flipped several times. Both Plaintiffs survived but sustained injuries.[4]

¶7. Initially, Hutton filed a complaint in Bolivar County Circuit Court against Bell, Hyundai Motor America, and Enterprise. Hutton initially claimed that Bell failed to exercise a proper degree of care by failing to maintain the vehicle on the roadway at all times. Hutton's claims against Enterprise included the failure to properly inspect, repair, and maintain the Hyundai Santa Fe before leasing it to Hutton. Hutton also pled a products-liability action against Hyundai for designing, manufacturing, and selling the Hyundai Santa Fe, claiming the vehicle was defective when it left the factory in an unreasonably dangerous condition. Hutton's complaint also alleged that the braking components of the vehicle were improperly, inadequately, negligently, and unsafely manufactured.

¶8. Bell answered, denying that his negligence caused the accident, and he pled a cross-claim, products-liability action against Hyundai and Enterprise—the same as Hutton. Enterprise also filed a cross-claim against Bell alleging that he was negligent. Before trial, Hutton, Bell, and Enterprise each settled their claims against one another. The case

---

[3] Bell separately testified four times in his deposition that he applied his brakes *after* the car pulled to the left. However, before concluding his deposition, Bell reversed his position when questioned by Plaintiffs' counsel, stating that he had his foot on the brakes, *braking* as he was *passing* the Wonder Bread truck.

[4] Hutton's injuries included a broken wrist, cuts on her forehead, and temporary shoulder and back pain. Bell suffered a compound fracture of his left forearm, a dislocated knee, and an injury to his left shoulder.

proceeded to trial with Hutton and Bell as co-Plaintiffs against Hyundai as the sole Defendant.

*Pretrial Jury Venire Procedures*

¶9.   During the initial roll call of the jury panel, defense counsel recognized that several potential jurors were no-shows. Concerned with being unable to obtain a jury representative of a cross-section of the county at large, counsel requested the opportunity to question the clerk regarding those absences. Counsel, addressing the Court, stated,

> We all received a jury panel report upon coming into the jury selection process this morning from Ms. Kelly or one of her deputy clerks. And in calling the roll earlier, we noticed quite a few absences. And then you, you know, I think properly excused some jurors. But we were noticing that there are a lot of gaps in the numbers themselves.
>
> . . . .
>
> But it will show -- and I am looking at mine and you will have yours. Well, you have got it there, I think, now. No number nine and then no number 12, no number 13, no number 14. No number 18. No number 19. And it will speak for itself. But there is no 25, no 28, no 31, 32 or 33 or 35 or 37 or 38. And just big gaps. And we were just curious if the first list, when it was drawn, was sequential, you know, one, two, three, four, five, right on through. And then there have been some people calling in begging off that have been excused before they ever got here. It is pretty obvious that is what happened because this list has got all these gaps in it, and we would like to ask the clerk what happened to them. Where did they go?

¶10.   Judy Weatherspoon, deputy clerk for Bolivar County, was questioned and volunteered that she gave all counsel a jury-panel report the first morning of jury selection. Weatherspoon explained,

> The reason it has gaps in it is, this is a revised list. I sent an excuse -- the excuses to the judge administrator the ones that have excuses, whether they are over the age of 65, it is going to cause a financial hardship, whatever

5

excuse they have. I give them to Teresa Thigpen, and she excuse them or do not excuse them, and we go by that. We excuse them in the system. We make a new list. That is why you are seeing the gaps.

As far as the darkened in, if they come in later than expected and I have already printed the list out, I just go on and mark them, and I darken it out.

Weatherspoon further stated that on the back of the jury form was an affidavit that could be filled out if they wanted to be excused. The excuses would be passed on to the court administrator, and the affidavits would be retained by the clerk's office.

¶11. Teresa Thigpen, court administrator for Judge Walls, was also examined.

[Mr. Luckett]  So the procedure is such that when the jury summonses go out, there is an opportunity for them to mail or bring in that affidavit on the back to claim a justifiable reason to be excused.

[Ms. Thigpen]  Correct.

Q.  And so they would get to you to deal with in the decision-making, and you turn it back to the clerk?

A.  Yes, sir.

When questioned about the appearance of a two-to-one female-to-male ratio, Thigpen stated that she did not notice that trend.

¶12. Counsel also questioned Circuit Clerk Marilyn Kelly about the demographics of the jury pool not matching the county's demographics. Kelly stated that "[h]istorically . . . more females register in our county and more females show up for court . . . ."

¶13. Following the examination, Hyundai requested a mistrial because the jury venire, from a gender standpoint, was not a proper representation demographically of Bolivar County. Plaintiffs argued that Hyundai had waived any objection by waiting until after the court

6

started voir dire and received all objections.

¶14. Hyundai requested that the clerk's office gather various documents to explain the "jury winnowing-down process" and that it be allowed to analyze the documents and to present additional arguments the next day, if necessary.

¶15. Hyundai argued that Mississippi Code Section 13-5-23 requires the judge to make a finding of "undue or extreme physical or financial hardship" if a juror provides that as an excuse. Miss. Code Ann. § 13-5-23(1)(b), (3)(c) (Rev. 2019). Hyundai argued that decisions based on excusing jurors for physical or financial hardship were made instead by the court administrator.

> It appears to us that the underrepresentation of a fair cross-section resulted from a failure of jurors to satisfy their obligation or to document lawful excuses, but notwithstanding the failure to document or the failure to meet a personal exemption, the Court, through the Administrator, excused all of these people, and we never had an opportunity, nor did the Court, to examine them.

Hyundai argued that the improper granting of excuses led to a reduced panel that did not represent a cross-section of the community.

> The long and short of this, Judge, 250 jurors were summonsed. 139 ended up on one of the interim lists. About a hundred, I think, showed up in the Courtroom. We ended up with a group of 68 as of yesterday. We lost some more this morning, I think three now, as you know. But we don't have the benefit of any of these that I've enumerated to ever have been here when we feel they should have been here and served their obligation on this jury.
>
> And it also appears that systemically looking at it, and it's mentioned in the supplemental brief, we are putting unemployed people on juries when the employed people are begging off and getting out of it somehow. And that's just not fair because that doesn't represent a cross-section of the community. The unemployment rate runs -- just announced today, it's decreased nationally to 5.9 percent, the lowest it's been in six years, and in Mississippi, probably lower than that now due to all the seasonal work. But the unemployment rate

7

on this jury is 60 percent of the first five, and it's about 30 or 40 percent of the first twelve. And we are giving up employed people to unemployed people on this panel. And we don't think that's fair to our side.

¶16. Plaintiffs argued that Hyundai failed to meet its burden of proof in showing that a specific group of people (e.g., white males) were specifically being excluded from jury duty. Even if the process of the court administrator making the decisions to excuse potential jurors was improper, Plaintiffs argued that the test was whether Hyundai could show that the process was designed to specifically exclude a certain group of people.

¶17. Hyundai argued that a mistrial was proper because the language in the statute was mandatory.

It's not something that we take lightly in this judicial system. Jury duty is required, and a lot of people are getting off of it because of a system that is allowing people to get excused before they ever get to Your Honor for a consideration under the very strict requirements, especially on the financial hardship aspect and the medical aspect.

¶18. The trial court denied the mistrial, finding that Hyundai failed to establish that a distinctive representative group had been systemically excluded. The trial court found that a violation of Section 13-5-23 was not sufficient to quash the entire jury venire and start afresh.

*Plaintiffs' Case-in-Chief*

¶19. During the trial, Eddie Butler testified that, at the time of the accident, he was traveling northbound, approximately three hundred yards from Hutton and Bell, who were traveling southbound. Butler testified that he saw the Hyundai travel "violently to the left and

8

came across the . . . northbound lane and went into what I call a jackknife,[5] a spin." The car came to rest upside down on the embankment. Butler testified that he never was questioned by any law enforcement. Butler did not recall seeing a vehicle in front of the Hyundai. Butler testified that "it seemed like the vehicle started to go into a spin" where there was a dark area or hole in the median.

¶20. Ricky Nelson, the driver of the Wonder Bread truck passed by Bell, testified that he witnessed the accident and did not observe any foreign objects in the roadway. State Trooper Ronald Shive testified that Bell informed him that he had lost control of the vehicle. Shive testified that he did not find any debris on the road or gauge marks in the asphalt.

*Plaintiffs' Designated Experts*

¶21. Over Hyundai's objections, Plaintiffs designated two persons as experts who were called to testify regarding their theories of the accident. Plaintiffs first designated Charles Miller, an auto-mechanic from Merigold, Mississippi, as an expert to testify about the defective design of the ABS. John Rinker, an engineer and metallurgist, was designated as an expert to testify that an object on the highway surface contacted the right front wheel speed sensor ring of the ABS and that the design of the ABS was defective.

¶22. Hyundai filed a motion in limine to exclude the testimony of both Miller and Rinker as unqualified and unreliable. Hyundai argued that although Rinker had a PhD in metallurgy and Miller had general maintenance and repair experience, neither was qualified to opine as to a design defect in the vehicle's ABS, a sophisticated system that involves computer

---

[5] Butler clarified that, to him, "jackknife" meant to flip over.

9

technology and electronic algorithms. The circuit court denied Hyundai's motion and found that the specific braking components were within the expertise of both the mechanic and metallurgist.

¶23.    Miller, an auto mechanic, was tendered and accepted by the trial court as an expert in the field of auto mechanics. He testified that he completed a course in automotives at a vocational institution, in addition to spending two semesters at Mississippi State University and three years at Delta State University, where he majored in political science and minored in philosophy; but, he testified, he did not graduate from either university. While in college, Miller opened a garage in Merigold, Mississippi. His testimony revealed that he had approximately thirty-two years of experience as a mechanic and received training from various parts manufactures. Miller admitted that he had never designed a braking system for production cars. He custom designed brake systems for race cars, but those cars do not use ABS. Miller offered that he took a course from Wagner Lockheed, an ABS company, learning how to test, service, and repair ABS.

¶24.    Miller testified that during the last eight years he had given more than one hundred depositions and had testified in twenty-five trials and that ten to fifteen of those trials had been for Plaintiffs' counsel.

¶25.    Miller testified that he first inspected the Hyundai Santa Fe on January 18, 2006, at a salvage yard, approximately one month after the accident. Six years later, Miller inspected and photographed the car.  At the time of the inspection, the car was sitting right side up on

a gravel parking lot on three tires.[6] Miller moved the car into a garage and jacked it up onto a jack stand. Miller testified that he observed that the tone ring for the ABS sensor was dislodged on the right front wheel. Miller described a tone ring as

> a metallic ring that is connected to the wheel, and it turns at the same speed as the wheel and the tire and the brake rotor. And it has teeth on it, and as these teeth pass in front of the sensor in rotation, it counts those teeth. And the computer knows how many teeth it takes to make a revolution, and by counting those teeth, it can accurately determine the mile per hour of each wheel on the car.

Miller said that a clamp had been dislodged from the rubber boot, which is located next to the tone ring. Miller testified that "something has come in contact with the axle itself and left a mark going across the axle and going across this area where this ring used to be located."

When questioned as to what caused the tone ring to become dislodged, Miller answered that

> From my inspection of the vehicle, it appeared to me that a metal object or some object -- I was thinking it was metal because of the furrow and as a mechanic. A metal object contacted the outer clamp of this boot, then struck the axle, struck the ring and dislodged the ring from the axle.

Miller testified that "[a]fter reviewing . . . information, the accident report and the other evidence, I determined that Mr. Bell had run over some object in the road. That object had come up and knocked this tone ring off the right front axle."

¶26.    Miller opined that the 2005 Hyundai Santa Fe's ABS was defective because the sensor ring was not protected. Miller further testified that the defective design caused the vehicle to be unnecessarily dangerous to users and that the manufacturer should have been aware of the defective design. Miller testified that an alternative design was used on the back wheels

---

[6] The left front tire was missing.

of the 2005 Hyundai, and that same design should have been used on the front wheels as well. Miller testified that had the alternative design been used on the front wheels, it would not have been possible for a "piece of debris to dislodge the tone ring." Miller testified that the lower control arm, also a metal part, approximately six inches wide and several inches long, found under the entire axle assembly, did not sufficiently protect the tone ring. Additionally, Miller testified that he found nothing else during his inspection of the car that would have made the car pull to the left except the displacement of the tone ring.

¶27. Miller conceded that he and no one else had ever identified or seen the object he opined dislodged the tone ring. Miller further conceded that he had never before seen this type of accident.[7] He further testified that he had never before heard of an accident like this one ever occurring nor had he ever heard of anyone else advancing or adopting his opinion/theory as a cause for an accident. Miller testified that, in more than three decades of working on cars, he had never serviced a Hyundai with a faulty ABS.

¶28. Miller acknowledged that Bell told the investigating officer that he lost control of the vehicle, never mentioning striking an object. Miller also acknowledged that the investigating officer, as was routine in a car-accident investigation, looked for debris on the highway and found none. Miller further testified that he did not observe any marks on the axle of the vehicle that would indicate any object had come in contact with the axle. However, when he performed tests in preparation for his testimony, intentionally knocking a tone ring askew with a hammer, left physical evidence of marks on the axle.

---

[7] He has been retained in more than three hundred cases.

¶29. Miller admittedly was not an accident reconstructionist. His theory was developed from Bell saying that he heard a noise, which Miller had opined was the tone ring being dislodged by an unknown piece of metal, and then applied the brakes, which caused the vehicle to pull to the left. He chose to disregard the multiple times Bell testified to the contrary.

¶30. After Miller's testimony, Hyundai moved for a mistrial, arguing that Miller was an auto mechanic who was not qualified to testify about the sophisticated design of an ABS. It argued a design engineer would be necessary to give competent testimony in this area.

> Mr. Miller . . . demonstrated that he either does not understand how an ABS system works or worse that he deliberately misled the jury about how such a system works. Mr. Miller was allowed to give accident reconstruction opinions regarding some phantom piece of metal coming up from some unidentified location without doing any of the . . . necessary engineering analysis that would be . . . needed to prove that such a strike was even possible.
>
> His opinion is wholly speculative and did not fit the known facts. It is nonsensical for a . . . non-design expert . . . to testify about a system . . . that is as sophisticated as the internal workings of an ABS system which involves computer technology and electronic algorithms and to justify such an opinion as based on reasonable auto mechanical certainty or words to that effect.
>
> . . . Mr. Miller did not use any scientific method to rule out driver error as the cause of the crash. In fact, he was not qualified to do so because he is not an accident reconstruction expert. Mr. Miller showed the jury exemplar parts which were seriously misleading because they excluded the lower control arm of the vehicle, which would have stopped the . . . phantom piece of metal he has theorized about from going where he told the jury that it went.
>
> Mr. Miller mislead the jury about how Mr. Bell testified that the accident actually happened, and finally, as the plaintiffs have done from the outset of the case, Mr. Miller made evidence prohibited by Rule 407 of the Mississippi Rules of Evidence the centerpiece of his opinion. Rule 407 says that when, after an injury, measures are taken which, if taken previously, would have made the injury or harm less likely to occur, . . . evidence of the

subsequent measures is not admissible to prove a defect in a product's design.

> That's exactly what was done here. That's been the centerpiece of the plaintiffs' case. It's the centerpiece of Mr. Miller's testimony, and we respectfully submit that our motion in limine on that issue was erroneously denied and that the trial at this point is fatally tainted by evidence admitted in direct violation of Rule 407 and that it's a waste of judicial resources and of this jury's time to spend any more time on this tainted trial. So we would respectfully move for a mistrial.

The trial court denied the motion for mistrial.

¶31. The Plaintiffs next called John G. Rinker, a consulting engineer with a bachelor's degree in mechanical engineering, a master of science degree in metallurgy, and a PhD in metallurgy. Rinker is a member of the ASM International, a materials information society, the Society of Automotive Engineers, and the International Society of Air Safety Investigators. Rinker became a full-time practicing consulting engineer in 1983. Rinker has been deposed more than one hundred times and has testified in court more than twenty-five times. Six of those court appearances were in cases for Plaintiffs' counsel. Rinker was tendered as an expert in the fields of mechanical engineering and metallurgy.

¶32. Rinker testified that he did not perform accident reconstructions. Rinker testified that he had never designed any component on a production vehicle. He testified that he does not hold himself out to be an expert in suspensions of vehicles and has never designed any braking systems. He did not hold any patents on ABS or tone rings. Rinker testified that this case was his *first* "tone-ring case." Rinker had no specific education in the computer systems involved in ABS. Rinker had never performed any mathematical calculations or algorithms for ABS. Rinker testified that he had never designed the sensors or components for an ABS.

14

Rinker testified that he was not aware who made Hyundai's ABS.

¶33. The trial court permitted Rinker to testify as an expert in the fields of mechanical engineering and metallurgy. Rinker testified that there were a series of marks in the area of the tone ring and that he found evidence of foreign-object damage.

¶34. Rinker stated that the photographs used to aid his testimony were taken *six years* after the accident. Rinker testified that there were alternative designs available at the time of the accident that would have prevented the displacement of the tone ring. Rinker testified that the design employed on the 2005 Hyundai Santa Fe was defective because an alternative design could have prevented the accident.

¶35. During a break in the direct examination of Rinker, Hyundai renewed its motion for a mistrial, alleging improper testimony and evidence of subsequent remedial measures. Hyundai argued that it had stipulated in the pretrial order that the feasibility of alternative designs was not disputed. The trial court also denied that motion.

¶36. Rinker testified that he never saw the object that he opined made the marks that were left behind on the Hyundai. He could provide no description of the phantom object except that it was metal and large enough to get underneath the lower control arm and make the marks. He could not describe the object's size, shape, dimensions, or composition. Rinker also conceded that no foreign objects or gauges in the asphalt were found at the scene of the accident.

¶37. Rinker testified that he did not perform any accident reconstruction, did not search for, read, or rely on any peer-reviewed literature regarding tone-ring dislodgment, and did not

15

conduct any type of calculations and/or apply any calculations for this case.

¶38. Rinker testified that the damage done to the tone ring occurred in approximately thirty-five milliseconds.

> Q. . . . And you talked about this UFO, the mystery metal, coming up and hitting the tone ring and knocking it off and putting that gouge in the metal that we looked at; correct?
>
> A. Correct.
>
> Q. And it did all that, and this thing is turning eight times a second. It did it in about 35 milliseconds, faster than you blink your eye?
>
> A. Yes.

¶39. After Hyundai offered witnesses, including its own experts, over the ten-day trial, the jury found for the Plaintiffs and awarded $192,948.79 to Hutton and $1,676,361.80 to Bell. Hyundai moved for a judgment as a matter of law in the form of a judgment notwithstanding the verdict (JNOV), or in the alternative, a new trial, or alternatively to alter or amend the judgment. Hyundai challenged the sufficiency of the evidence supporting the verdict, the reliability of Plaintiffs' expert opinions, and other trial errors, and it raised two issues concerning the integrity of the jury. The circuit court denied all posttrial motions.

## ISSUES

¶40. Hyundai raises four issues on appeal.

> **I.** **Whether the circuit court erred by prohibiting Hyundai from cross-examining Hutton regarding the original lawsuit against her coplaintiff, Bell.**
>
> **II.** **Whether the circuit erred by allowing Miller and Rinker to testify as experts.**

16

**III.** **Whether the circuit court erred by allowing improper venire procedures and improper conduct during voir dire.**

**IV.** **Whether the circuit court erred by admitting evidence of a subsequent remedial measure.**

## ANALYSIS

### I.    Cross-Examination of Hutton

¶41.    Hyundai argues that the trial court erred by refusing to permit it to cross-examine Hutton regarding her claims that Bell negligently "fail[ed] to maintain his vehicle in the roadway." Hyundai sought to impeach Hutton as to her testimony that Hyundai exclusively caused the accident. Hyundai alleges it was error to prevent it from cross-examining Hutton regarding the inconsistency between her initial allegations and her position at trial after settling with Bell.

¶42.    Plaintiffs counter that Hyundai mentioned to the jury three times that Hutton originally sued Bell. Plaintiffs' argument is somewhat misleading. Hyundai did mention in opening statements that Bell informed the state trooper that he lost control of the car and that Hutton claimed that Bell caused the accident. However, "opening statements do not constitute evidence, and [Hyundai] is allowed to argue its theory of the case." *Hutto v. State*, 227 So. 3d 963, 986 (Miss. 2017). When Hyundai attempted to cross-examine Hutton, Plaintiffs objected, and the trial court refused to allow Hutton to answer whether she previously had claimed that Bell caused the accident.

¶43.    The trial court cited Mississippi Rule of Evidence 408, which prohibits evidence of a settlement from being used to prove or disprove the settling party's liability, and found that

17

the rule should be extended to prohibit evidence of the fact that a settling party had been sued. However, the advisory committee note to Rule 408 dictates that "Rule 408 only excludes offers when the purpose is proving the validity or invalidity of the claim or amount. Therefore, an offer for another purpose may well be admissible at trial." MRE 408 advisory comm. n.

¶44.  Mississippi Code Section 85-5-7(2) (Rev. 2011) requires that fault be apportioned between all joint tortfeasors. In *Smith v. Payne*, the Court held that a jury was entitled to know that prior to settlement the plaintiff brought suit against another party, claiming that party was at fault for the accident, and that the jury was obligated to determine the percentage of fault of all tortfeasors. *Smith v. Payne*, 839 So. 2d 482 (Miss. 2002).

> The jury in the case sub judice was obligated to determine Long's percentage of fault irrespective of his status as a party at the time of trial. Logically, the jury was entitled to know that, up until the settlement, both the plaintiffs and the Hoods were claiming that John Long was at fault for the accident and brought suit against him seeking a recovery for the same. The trial judge did not err by allowing the jury to be informed of the settlement agreement.

*Id.* at 487. Bell was listed on the special verdict form as a joint tortfeasor, and the jury allocated zero percent of the fault to him.

¶45.  We find that the trial court erred by refusing to permit Hyundai the opportunity to impeach Hutton as to her testimony that Hyundai exclusively caused the accident. This refusal resulted in Hyundai's not having a fair trial, which constituted reversible error.

## II.  Testimony of Miller and Rinker

¶46.  Hyundai argues that Plaintiffs failed to prove the elements of their design-defect claim

18

and asks this Court to reverse and render judgment in its favor. In a products-liability action, the plaintiff must prove the following:

> (1) The danger presented by the product's design was known or should have been known to the manufacturer (i.e., the danger was foreseeable); (2) the product failed to function as expected (as a result of a design characteristic); (3) an alternative design existed that would not impair the product's usefulness or desirability; and (4) the alternative design would have to a reasonable probability prevented the harm.

*Phillips 66 Co. v. Lofton*, 94 So. 3d 1051, 1060 (Miss. 2012) (quoting *Williams v. Bennett*, 921 So. 2d 1269, 1274 (Miss. 2006)). Hyundai contends that Plaintiffs' attempts to satisfy each of the required elements failed because Plaintiffs relied on inadmissible expert testimony under *Daubert*[8] and Mississippi Rule of Evidence 702.

¶47. "[T]he admission of expert testimony is within the sound discretion of the trial judge. . . . Therefore, the decision of a trial judge will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" *McKee v. Bowers Window & Door Co., Inc.*, 64 So. 3d 926, 931-32 (Miss. 2011) (alterations in original) (internal quotation marks omitted) (quoting *Kilhullen v. Kansas City S. Ry.*, 8 So. 3d 168, 172 (Miss. 2009)). At the time of trial, Mississippi Rule of Evidence 702 stated:

> [if] scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[8] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

MRE 702. "An expert is qualified 'only if the witness possesses scientific, technical, or specialized knowledge *on [the] particular topic*' of his opinion." ***Inn By the Sea Homeowner's Ass'n, Inc. v. Seainn, LLC***, 170 So. 3d 496, 505 (Miss. 2015) (emphasis added) (quoting ***Bailey Lumber & Supply Co. v. Robinson***, 98 So. 3d 986, 992 (Miss. 2012)).

> Under Rule 702, expert testimony should be admitted only if it withstands a two-pronged inquiry. ***Kansas City S. Ry. v. Johnson***, 798 So. 2d 374, 382 (Miss. 2001). First, the witness must be qualified by virtue of his or her knowledge, skill, experience or education. ***Id.*** (citing M.R.E. 702). Second, the witness's scientific, technical or other specialized knowledge must assist the trier of fact in understanding or deciding a fact in issue. ***Id.***

***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 35 (Miss. 2003).

¶48.    The ***Daubert*** Court adopted a nonexhaustive list of factors to assist in determining the admissibility of expert testimony:

> The focus of this analysis "must be solely on principles and methodology, not on the conclusions they generate." These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance with a relevant scientific community. The applicability of these factors depends on the nature of the issue, the expert's particular expertise, and the subject of the testimony.

***McLemore***, 863 So. 2d at 36-37 (citations omitted).

> Under Rule 702, the trial judge has "discretionary authority, reviewable for abuse, to determine reliability in light of the particular facts and circumstances of the particular case." ***McLemore***, 863 So. 2d at 39 (quoting ***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 158, 119 S. Ct. 1167, 1179, 143 L. Ed. 2d 238 (1999)). But such "discretionary authority" does not extend to expert testimony based only upon "subjective beliefs or unsupported speculation." ***McLemore***, 863 So. 2d at 36 (citing ***Daubert***, 509 U.S. at 590,

20

113 S. Ct. 2786). *See also **Gulf South Pipeline Co. v. Pitre***, 35 So. 3d 494, 499 (Miss. 2010) ("merely speculative expert opinions should not be admitted"); ***Watts*** [***v. Radiator Specialty Co.***], 990 So. 2d [143,] 149 [(Miss. 2008)] (quoting ***Gen. Elec. Co. v. Joiner***, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997)) ("nothing in either ***Daubert*** or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert"); ***Edmonds v. State***, 955 So. 2d 787, 792 (Miss. 2007) ("a court should not give . . . an expert carte blanche to proffer any opinion he chooses").

***Dedeaux Util. Co. v. City of Gulfport***, 63 So. 3d 514, 522 (Miss. 2011).

¶49. We find that Miller testified outside the scope of his expertise. He lacked the qualifications required by Rule 702 to qualify to testify that the ABS was defectively designed. Miller is an auto mechanic with decades of experience repairing vehicles. His education of completing high school and attending a vocational school demonstrates his lack of scientific, technical, or other specialized knowledge to testify about, to give an opinion, or to apply facts relying on scientific principles and methods. Miller's college attendance—studying political science and philosophy—without obtaining a degree is ineffectual. As to his specialized training and education, Miller testified:

> As independent mechanics, we get training from the various parts houses, the different manufacturers. The people that . . . build these parts that we use to *fix* people's *cars* with knowledge that if we don't get the training and the knowledge to *work on* the newer systems, the newer brake systems and computer systems and engine systems—if we don't know how *to repair* those systems and buy their parts, they won't make any money. And so they bring down seminars, and independent mechanics, such as myself, we attend seminars and schools.

(Emphasis added.) While Miller may well be an excellent mechanic and has received extensive training in auto repair, he lacks education, experience, or training in the field of automotive *design*. Miller testified he received ABS training on how *to test, to service, and*

21

*to repair* ABS. He never offered any design credentials. And while Miller designed non-ABS brake systems for race cars (which do not use ABS), he testified that he never designed a braking system for a production car such as the Hyundai Santa Fe and never designed an ABS.

¶50. Morever, Miller's testimony was wholly speculative and contradicted facts in the record. A photograph taken by police immediately after the crash showed the tone ring in place, with no dislodgement or marks on the control arm. Miller's photograph that he alleges revealed a dislodged tone ring was taken six years after the crash and after the car had been moved to the junkyard. Hutton's other witness, Rinker, did not testify that the tone ring was knocked askew; he testified that it had been completely displaced. Miller's testimony was outside his field of expertise and was not supported by the record evidence. The circuit court erred by allowing Miller to testify as an expert in ABS designs.

¶51. "Where an expert admits that no basis satisfying the accepted criteria for that profession exists for an opinion, the opinion should be excluded." ***Pitre***, 35 So. 3d at 499; *see also* ***Edmonds***, 955 So. 2d at 792; ***Tunica Cnty. v. Matthews***, 926 So. 2d 209, 214 (Miss. 2006); ***McLemore***, 863 So. 2d at 41. Miller's testimony was purely subjective, little more than speculation. Miller had acquired no knowledge of a similar accident ever occurring, either through experience, training, or education. His proffered opinion was not supported by any treatise, peer-reviewed publication, or any other scientific article. Miller had no experience and had never been trained in designing ABS. His proffered opinion was not based on any reliable scientific principles or methods. As his opinion lacked reliability when

examined through the lens of Rule 702, it should have been excluded.

¶52.    John Rinker also testified for the Plaintiffs that the 2005 Hyundai Santa Fe was defective in design due to its lack of ABS protection. Rinker has a bachelor's degree in mechanical engineering and a master of science degree and a PhD in metallurgy. Rinker testified that mechanical engineers are trained to design and evaluate designs, unlike Miller. Rinker also testified that he had experience working for automotive manufacturers including Ford and Honda. But Rinker also testified that he had never designed an ABS. He had never done design work for a single auto manufacturer. He had never been qualified to testify in a case involving an ABS tone ring. He only offered that he acquired knowledge by "study and examination" of braking systems, but he offered no peer-reviewed material or publications addressing the causation of a similar accident as he opined in this case.

¶53.    Assuming, arguendo, that Rinker was qualified under the first prong of *Daubert* and Mississippi Rule of Evidence 702,[9] the second prong requires that expert testimony be reliable, so as to assist the trier of fact.  MRE 702; *McLemore*, 863 So. 2d at 35. Hyundai argues that both Miller and Rinker lacked reliability because they applied no methodology at all in opining that the Santa Fe's ABS was defectively designed. Neither Miller's nor Rinker's testimony was sufficiently reliable to satisfy *Daubert* and Rule 702.

¶54.    Rinker conducted no testing whatsoever to support his *ipse dixit* theory that the ABS was defectively designed.  Rinker merely attended the testing done by Miller. Plaintiffs do

---

[9] This Court has already held that Miller was not qualified under the first prong. However, this Court also holds that Miller's testimony was not reliable and was purely speculative.

not dispute this in their brief. Rinker had acquired no knowledge of a similar accident ever occurring, either through experience, training, or education. His proffered opinion was not supported by any treatise, peer-reviewed publication, or any other scientific article. Rinker's proffered opinion was not based on any reliable scientific principles or methods. As his opinion lacked reliability when examined through the lens of Rule 702, it should have been excluded.

¶55. When addressing Rinker's methodology used to reach his conclusion, Plaintiffs state merely that Rinker's opinion was based on "reliable facts." Rinker came to his conclusion by examining police photographs, examining the Santa Fe, and taking numerous photographs of his own. Rinker testified that he did not conduct an accident reconstruction. He did not offer an alternative design. He did not do a cost analysis. He did not review or rely upon any peer-reviewed literature on tone-ring dislodgment because there is none. He did not review or rely upon literature from the Society of Automotive Engineers. He did not conduct any calculations. When Rinker was asked specifically about how much force was required to dislodge a tone ring, he testified that he did not know, but he conceded that there was a formula he could have used. Rinker testified that he did not calculate the kinetic energy, did not conduct a time analysis, and did not conduct a directional analysis. Rinker testified that instead, he "traced" the way the marks were made. Regarding Miller's testing, Rinker testified that he "participated" in Miller's testing, but the record demonstrates otherwise. Miller conducted the limited testing, and Rinker simply observed. Rinker reached his expert *ipse dixit* opinion by looking at photographs, the Santa Fe, and an exemplar vehicle—nothing

24

more.

¶56.　We find that Rinker's testimony was unreliable and fails to satisfy ***Daubert*** and Rule 702.　The analysis regarding whether an expert's opinion is sufficiently reliable must be based "solely on *principles and methodology*, not on the *conclusions* they generate." ***McLemore***, 863 So. 2d at 36 (emphasis added) (internal quotation mark omitted) (quoting ***Daubert***, 509 U.S. at 595). Rinker generated a conclusion that the Santa Fe's ABS was defectively designed, but he provided no methodology concerning how he reached that conclusion.　Because of Miller's and Rinker's lack of credentials and lack of evidentiary support, Plaintiffs' products-liability claim necessarily fails.

¶57.　In attempting to prove their products-liability claim of defective design, Plaintiffs offered two experts, neither of whom were qualified to offer opinions as to whether the Hyundai ABS was defectively designed. Neither expert's testimony was based upon sufficient facts or data, nor was their testimony the product of reliable principles or methods. Their theories have not been tested or subjected to peer review or publication. Neither offered testimony that their opinions were widely accepted in the scientific community. Both admitted that they had never seen or even heard of an accident being caused by a dislodged tone ring. Their testimony, which was based on their subjective beliefs and unsupported speculation, fails to satisfy Rule 702 and ***Daubert*** and should have been excluded. Failure to exclude such testimony was reversible error.

### III.　Improper Jury Venire

¶58.　Having found reversible errors and rendered judgment in favor of the Defendant, we

25

would generally not consider additional issues. However, when the "public interest"[10] is at stake, this Court will review an otherwise moot issue if "the question concerns a matter of such nature that it would be distinctly detrimental to the public interest that there should be a failure by the dismissal to declare and enforce a rule for future conduct." *Alford v. Miss. Div. of Medicaid*, 30 So. 3d 1212, 1214 (Miss. 2010) (internal quotation mark omitted) (quoting *Sartin v. Barlow ex rel. Smith*, 196 Miss. 159, 16 So. 2d 372, 376-77 (1944)); *see also Lafayette Cnty. Bd. of Supervisors v. Third Cir. Drug Ct.*, 80 So. 3d 785, 788 (Miss. 2012). Very few rights could be of greater public interest than the constitutional guarantee of an "inviolate" jury trial. *See* Miss. Const. art. 3, § 31.

¶59.    Hyundai argues that the integrity of the jury was compromised by 1) being improperly influenced by Pastor C.L. Sparks,[11] 2) being assembled in violation of Mississippi statutes, and 3) the resulting venire's not being a representative cross-section of the community. Hyundai examined the deputy clerk and court administrator to determine if the jury venire had been assembled in accordance with Mississippi law. The deputy clerk and court administrator testified that the complained of procedure indeed did occur in today's case. *See State Oil & Gas Bd. v. McGowan*, 542 So. 2d 244 (Miss. 1989); *Bd. of Trs. of Pascagoula*

---

[10] *See* Miss. Code Ann. § 13-5-2 (Rev. 2019).

[11] This Court recently reversed a jury verdict based on evidence of improper influence on a jury, wherein Sparks and one of his counsel misled the trial court about their relationship. *See Hyundai Motor Am. v. Applewhite*, 319 So. 3d 987, 1003-04 (Miss. 2021). In this case, Hyundai did not develop evidence of improper jury influence, arguing only that Sparks appeared in the courtroom on the first day of this trial and that he was separated from mingling with the jurors when spotted by a bailiff. The record in this case revealed that Plaintiffs' counsel advised the trial judge that Sparks had been instructed to leave the courtroom.

***Mun. Separate Sch. Dist. v. Doe***, 508 So. 2d 1081 (Miss. 1987); ***Strong v. Bostick***, 420 So. 2d 1356 (Miss. 1982). The trial court overruled Hyundai's motions on all three issues. Given that it is in the public's interest that such should not reoccur, we proceed. Thus, we address arguments 2 and 3.

¶60.   Respect for the sanctity of an impartial trial requires that courts guard against even the appearance of unfairness for "public confidence in the fairness of jury trials is essential to the existence of our legal system. Whatever tends to threaten public confidence in the fairness of jury trials, tends to threaten one of our sacred legal institutions."

***Page v. Siemens Energy & Automation, Inc.***, 728 So. 2d 1075, 1081-82 (Miss. 1998) (quoting ***Toyota Motor Corp. v. McLaurin***, 642 So. 2d 351, 356 (Miss. 1994)).

¶61.   "Both federal and state constitutions secure to persons the right to be tried before a fair and impartial jury. Selection of a jury from a representative cross-section of the community is an essential component of that right." ***Adams v. State***, 537 So. 2d 891, 893 (Miss. 1989) (citing ***Taylor v. Louisiana***, 419 U.S. 522, 528, 95 S. Ct. 692, 697, 42 L. Ed. 2d 690, 697 (1975)). "It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court . . . ." Miss. Code Ann. § 13-5-2 (Rev. 2019). Mississippi's jury-service statutes strictly limit a court clerk's or administrator's authority to excuse would-be jurors from service. A clerk may grant excuses only for medical unfitness certified by a doctor (Mississippi Code Section 13-5-23(2) (Rev. 2019) and age (Mississippi Code Section 13-5-25 (Rev. 2019)). Excuses for "undue or extreme physical or financial hardship" must be decided by the judge, not clerks or judicial staff. *See* Miss. Code Ann. § 13-5-23(1)(b) (Rev. 2019); Miss. Code Ann.

§ 13-5-23(3)(c) (Rev. 2019) ("A judge of the court for which the individual was called to jury service shall decide [hardship excuses].").[12]

¶62. In this trial, 250 names were initially drawn and summoned. Of those, forty-two were unexplained no-shows; forty-nine had moved from the county or could not be located; four were purged from the juror list; twenty-four were excused for age; and six were properly excused for medical or other appropriate reasons. Of the remaining 131 potential jurors, the *clerk* and *court administrator* unilaterally excused approximately thirty-eight (or nearly 30 percent). Hyundai argues that this resulted in "a jury venire that did not reflect a fair cross section of the population with respect to several distinctive groups, including males (just thirty-one percent of the venire as compared to 46.5% overall and people with jobs (20% of the venire was unemployed, as compared to just 8.5% of Bolivar County)."

¶63. The deputy clerk and the court administrator testified that the procedure used to excuse duly summoned jurors in that jurisdiction was for the court administrator, as opposed to the trial judge, to "deal with" excuses. Prior to the date the jurors were summoned to appear before the trial judge and trial counsel, jurors were allowed to call in, mail in, or physically drop by with a myriad of excuses, none of which were vetted by the trial judge. The deputy clerk testified that she sends "the excuses to the administrator . . . whether they are over the age of 65, it is going to cause a financial hardship, whatever excuse they have." The deputy clerk then "give[s] them to Thigpen [the court administrator], and [Thigpen]

---

[12] The Circuit Clerk of Bolivar County at the time of this trial remains in that position today. The court administrator is at present the same court administrator that testified in these proceedings.

excuse[s] them or do[es] not excuse them, and we go by that" and "make a new list." The deputy clerk testified that those jurors Thigpen said were to be excused no longer appeared on their jury list. Thigpen testified that when she was given the affidavits by the clerk's office, she would act on them as the court administrator because she "deal[t] with . . . the decision-making, and . . . [then turned] it back [in] to the clerk." Neither she nor the trial judge presiding over the proceedings offered that she had done so in consultation with that judge or that the duty had been delegated to her by that judge as suggested by the dissent. King Diss. Op. ¶ 102.

¶64. We have "never condoned a venire selection process completely contrary to [our laws] wherein the clerk [does] that which the law expressly prohibits." *Adams*, 537 So. 2d at 895. In *Adams*, the clerk unilaterally removed from the initial draw people who had recently served on a jury and those who were sixty-five or older so that they were not summoned and given the option to serve. *Id.* at 891. The Court reversed the verdict and condemned the process as "not a case of substantial compliance or minor deviation" but rather a "practice . . . completely contrary to law." *Id.* at 895.

¶65. Presiding Justice King opines that jury selection statutes are directory and that "following juror exemption statutes literally is not necessary when doing so is impracticable." King Diss. Op. ¶ 103 (citing *Parker v. State*, 201 Miss. 579, 29 So. 2d 910 (1947); *Thomas v. State*, 818 So. 2d 335, 340 (Miss. 2002)). However, there is no evidence in today's case that any of the hypotheticals used by the *Parker* Court existed in today's case. There is nothing in the record justifying the trial judge's failure to comply with Section 13-5-23(3)(c),

which reads that "[a] *judge* of the court for which the individual was called to jury service *shall decide* whether to excuse an individual under subsection (1)(b) of this section." Miss. Code Ann. § 13-5-23(3)(c) (emphasis added). Section 13-5-23(1)(b) addresses "undue or extreme physical or financial hardship." Miss. Code Ann. § 13-5-23(1)(b).

¶66.    Section 13-5-87, which has been in existence without significant change since at least 1857, reads:

>     All the provisions of law in relation to the listing, drawing, summoning and impaneling juries are directory merely, and a jury listed, drawn, summoned or impaneled, though in an informal or irregular manner, shall be deemed a legal jury after it shall have been impaneled and sworn, and it shall have the power to perform all the duties devolving on the jury.

Miss. Code Ann. § 13-5-87 (Rev. 2019). But Section 13-5-23, which has been amended numerous times, most recently in 2007, has added the mandatory language found in subsections (2) and (3)(c):

>     (2) An excuse of illness under subsection (1)(a) of this section may be made to the clerk of court outside of open court by providing the clerk with a certificate of a licensed physician, stating that the juror is ill and is unfit for jury service, in which case the clerk may excuse the juror. If the excuse of illness is not supported by a physicians certificate, a judge of the court for which the individual was called to jury service *shall* decide whether to excuse an individual under subsection (1)(a) of this section. . . .

>     (3)(c) A judge of the court for which the individual was called to jury service *shall* decide whether to excuse an individual under subsection (1)(b) of this section.

Miss. Code Ann. § 13-5-23(2), (3)(c) (emphasis added). The latest pronouncement of the Legislature's will controls. *See **Belk v. Bean***, 247 So. 2d 821, 826-27 (Miss. 1971) (explaining the doctrine of "implied amendments"). Moreover, this Court has held that

30

> We recognize that trial courts have the authority and power to follow their procedures for expediting business of the court and that the courts' direction in selecting juries ordinarily is within the sound discretion of the trial judge, *but the jury selection method should be followed as set forth in the statute*.

*Harris v. State*, 406 So. 2d 823, 824 (Miss. 1981) (emphasis added) (citing *Peters v. State*, 314 So. 2d 724 (Miss. 1975)).

¶67.    In today's case, failure to comply with our statutes and our case law setting forth jury-selection methods was established. There should be no doubt that such violations, as raised today, may be a basis for grounds for appeal, but relief must be sought before the jury is impaneled and sworn. From this day henceforth, all circuit clerks, judges, attorneys, and other court personnel throughout our state shall abide by our statutes and case law.

### IV.    Testimony of a Subsequent Remedial Measure

¶68.    As we reach today's final issue, we have already identified reversible errors that result in reversing the jury's verdict and rendering judgment in favor of Hyundai. Thus, we decline to address this issue.

### CONCLUSION

¶69.    We reverse the jury's verdict and render judgment in favor of Hyundai.

¶70.    **REVERSED AND RENDERED.**

   **BEAM, ISHEE AND GRIFFIS, JJ., CONCUR.  COLEMAN, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION.  KITCHENS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J. KING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KITCHENS, P.J. MAXWELL AND CHAMBERLIN, JJ., NOT PARTICIPATING.**

   **COLEMAN, JUSTICE, SPECIALLY CONCURRING:**

¶71.    I concur in full with the result and almost all of the reasoning of the majority.  I write

separately to explain one point of disagreement regarding the admissibility of Charles Miller's opinion testimony. I disagree with the majority only in that, in my opinion, Miller's background, training, and experience with anti-lock brake systems would have otherwise sufficed to qualify him to offer expert opinion testimony pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the various cases cited by the majority that stem from it. However, as ably described by the majority, Miller's testimony lacked a sufficient basis in the facts. Maj. Op. ¶¶ 50-51. Accordingly, I agree with the majority that the trial court abused its discretion by admitting it.

### KITCHENS, PRESIDING JUSTICE, DISSENTING:

¶72. Because I find no reversible error, I respectfully dissent. I disagree with the majority's finding that the trial court abused its discretion by admitting the testimony of Charles Miller, an experienced automobile mechanic who examined the subject vehicle and performed testing, and John Rinker, a mechanical engineer and metallurgist who testified based on his observations, experience, and reliance on Miller's testing and witness testimony. Because the majority holds that all of the plaintiffs' expert testimony should have been excluded, it reverses and renders the jury's verdict for the reason that, without the expert testimony, Hutton and Bell (collectively, "Hutton") cannot prove their case. I would hold that the trial court was within its discretion in ruling that, under Rule 702 of the Mississippi Rules of Evidence, Miller and Rinker were qualified to render testimony in their respective fields of expertise and that their testimony was reliable. The majority's analysis adopts arguments advanced by Hyundai evincing its view of the weight of the evidence that are improper for

32

evaluating the admissibility of expert testimony. I likewise find no error in the trial court's

admission of a subsequent remedial measure under Rule 407. Moreover, because the matter

of Bell's fault was squarely before the jury, I would find that Hyundai was not prejudiced by

any error of the trial court in limiting its cross-examination of Hutton about her having

blamed Bell for the accident. I join Presiding Justice King's dissent on the venire issue. I

would affirm.

### I.    Expert Testimony

¶73.    Mississippi Rule of Evidence 702 governs the admission of expert testimony and

provides that

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)**    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)**    the testimony is based on sufficient facts or data;
>
> **(c)**    the testimony is the product of reliable principles and methods; and
>
> **(d)**    the expert has reliably applied the principles and methods to the facts of the case.

MRE 702. This Court applies the test from ***Daubert v. Merrell Dow Pharmaceuticals, Inc.***,

509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), as modified by ***Kumho Tire Co.***

***v. Carmichael***, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), in evaluating the

admissibility of expert testimony under Rule 702. ***Miss. Transp. Comm'n v. McLemore***, 863

So. 2d 31, 35 (Miss. 2003). Under this standard, the trial court first must determine whether

the witness is qualified. *Id.* Then, the trial court must determine whether the testimony is both relevant and reliable. *Id.* at 38. "Because the trial court is vested with gatekeeping responsibility, it must make a preliminary assessment regarding the scientific validity of the reasoning or methodology underlying the expert testimony and the proper application of that reasoning or methodology to the facts of the case at issue." *Union Carbide Corp. v. Nix*, 142 So. 3d 374, 388 (Miss. 2014) (citing *McLemore*, 863 So. 2d at 36).

¶74.     *Daubert* set forth a non-exhaustive list of factors for determining reliability:

> These factors include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*McLemore*, 863 So. 2d at 37 (citing *Daubert*, 509 U.S. at 592-94). Application of the factors is to be "flexible" such that a given factor should be considered only when it is a "reasonable measure[] of the reliability of expert testimony" in the specific case. *Id.* (citing *Kumho Tire*, 526 U.S at 152). *Kumho Tire* explained that

> It might not be surprising in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may never previously have interested any scientist. Nor, on the other hand, does the presence of *Daubert*'s general acceptance factor help show that an expert's testimony is reliable where the discipline itself lacks reliability, as, for example, do theories grounded in any so-called generally accepted principles of astrology or necromancy.

*Kumho Tire*, 526 U.S. at 151. Importantly, the trial court's analysis of the *Daubert* factors should focus on "principles and methodology, not on the conclusions." *Union Carbide*, 142 So. 3d at 388 (citing *McLemore*, 863 So. 3d at 36-37).

34

¶75. An opponent is not without resources for attacking admissible expert testimony, which include "[v]igorous cross examination, presentations of contrary evidence, and careful instruction on the burden of proof . . . ." *McLemore*, 863 So. 2d at 36 (internal quotation marks omitted) (quoting *Daubert*, 509 U.S. at 595-96). This Court's role in assessing the admissibility of expert testimony is limited to determining whether the trial court abused its discretion. *Union Carbide*, 142 So. 3d at 388 (quoting *City of Saltillo v. City of Tupelo (In re Boundaries of the City of Tupelo)*, 94 So. 3d 256, 267 (Miss. 2012)). "A trial judge's decision as to whether a witness is qualified to testify as an expert is given the widest possible discretion." *Univ. of Miss. Med. Ctr. v. Pounders*, 970 So. 2d 141, 146 (Miss. 2007) (citing *Smith v. State*, 925 So. 2d 825, 834 (Miss. 2006)).

¶76. Hutton's theory of the case was that an object in the road had struck a component of the 2005 Hyundai Santa Fe's anti-lock braking system, causing a sensor to malfunction, which made the vehicle pull to the left when Bell applied the brakes, causing the vehicle to leave the road and roll over several times. Hutton presented the expert testimony of Miller and Rinker to support this theory. They testified that gouge marks near the sensor indicated that the sensor's "tone ring," which sends signals to the sensor, had been struck and knocked askew by a foreign object, causing a braking malfunction. Bell testified that he heard a noise while driving and that the vehicle began pulling to the left. Bell's testimony was inconsistent on whether the vehicle started pulling when he applied the brakes, which supported his theory, or whether it was pulling before he applied the brakes, which supported Hyundai's theory that the accident had occurred because Bell lost control of the vehicle while passing

35

a truck. According to the testimony of Hyundai's experts, Hutton's theory was impossible. They testified that the gouge marks and tone ring disturbance did not happen at highway speeds and could only have occurred some time after the accident. One reason Hyundai posited that the accident could not have been caused by a foreign object was that the vehicle had a part called a lower control arm that provided protection to the tone ring from a foreign object strike.

¶77.    The majority expresses evident disdain for the plaintiffs' theory that the vehicle struck a piece of road debris that caused it to malfunction. Although the majority derides the plaintiffs' theory of a "phantom object" and places much weight in its analysis on the fact that no object was found, in my view, few drivers on Mississippi roads would be surprised that a piece of road debris might strike and damage the underside of a vehicle. Maj. Op. ¶¶ 2, 3, 36. Also unsurprising is the notion that such an object would not be found during an officer's routine inspection of a four-lane divided highway and adjacent areas immediately after a catastrophic  collision. That scenario does not strike me as inherently bizarre or far-fetched. Whether it occurred in this case was a matter for the jury, not for this Court, to resolve.

¶78.    The majority finds that both of Hutton's experts, Miller and Rinker, were not qualified to render expert testimony in this case and that their testimony was unreliable. I disagree and would hold that the trial court properly performed its gatekeeping function in finding that their expert testimony was admissible. I observe that this Court's role is limited to reviewing the trial court's discretionary ruling and that our opinion about the conclusions generated by

36

the experts is unimportant because our ***Daubert*** analysis must focus on each expert's principles and methodologies.

> ### A. Miller's testimony did not exceed his qualifications as an experienced automobile mechanic, and his opinions were reliable.

¶79. The trial court accepted Miller as an expert in the field of automobile mechanics. Miller opined that, to a reasonable degree of automotive mechanical certainty, Derek Bell had run over an object in the road that had knocked the tone ring on the 2005 Hyundai Santa Fe's right front axle askew, causing a sensor to send erratic signals to the vehicle's anti-lock braking (ABS) system, which in turn caused the vehicle to pull to the left when Bell applied the brakes, and that caused Bell to run off the road. Miller testified that he has worked on brakes since beginning his career as an automobile mechanic thirty-two years ago. He had taken a course on ABS repair, but he never had designed an ABS system. He explained that his job includes determining why a vehicle's part failed and then repairing or replacing it. Miller said that, as a mechanic, he has dealt with and is very familiar with situations in which a driver has run over an object in the road causing damage to the underside of the vehicle. Miller testified that in those situations the driver sometimes is unaware of having run over something.

¶80. Miller testified that he reached his opinion on how the crash occurred from the marks left on the axle and other components and the way Bell said the vehicle had behaved before the crash. From his expertise as a mechanic, Miller testified that a tone ring turns at the same speed as the wheel and has teeth on it that connect to a sensor and allow the ABS to

37

determine how fast the wheel is turning. He explained that if the tone ring is dislodged, the sensor does not touch all the teeth, which the ABS interprets as meaning that the wheel is sliding. That causes erratic braking. He testified that the fact that the 2005 Santa Fe's right tone ring was dislodged could have caused the vehicle to pull to the left during braking. Miller said that gouge marks on the axle near the tone ring indicated that the tone ring had become dislodged when some object had struck it. He testified that the lower control arm, which is six inches wide, provided some protection to the tone ring, but not complete protection, and that the object in this case had avoided the lower control arm by coming in from the side. Miller testified that he performed a test on another 2005 Hyundai Santa Fe to replicate the conditions of the accident. He adjusted the vehicle's tone ring in the same manner as on the wrecked vehicle so that the sensor was not touching all of the tone ring's teeth, which caused an erratic signal. He drove the car in that condition at speeds lower than those in the accident. Miller testified that the vehicle pulled to the left during this testing and that he had difficulty holding the steering wheel. And he said he found no other condition on the vehicle that could have caused it to pull to the left.

¶81.    The majority finds that Miller's testimony should have been excluded because he has never designed an ABS. But "a witness need not be a specialist in any particular profession to testify as an expert." *Pounders*, 970 So. 2d at 146 (citing *Hubbard v. Wansley*, 954 So. 2d 951, 957 (Miss. 2007)). "The scope of the witness's knowledge and experience, and not any artificial classification, governs the question of admissibility." *Id.* (citing *West v. Sanders Clinic for Women, P.A.*, 661 So. 2d 714, 719 (Miss. 1995)). I find that Miller's

testimony was well within his expertise as an automobile mechanic. An expert is allowed to testify from "knowledge, skill, experience, training or education." MRE 702. Miller was trained in the repair of ABS. He had thirty-two years' experience working as an automobile mechanic. Miller was qualified to diagnose a displaced tone ring because that is the type of repair work he does every day. Miller opined also that the 2005 Santa Fe was defectively designed because the tone ring was not protected fully, causing it to be unreasonably dangerous to users. But Miller needed no additional expertise to reach that opinion; he did not need engineering or design experience to develop an alternative design because a feasible alternative design was present on the rear wheels of the very 2005 Santa Fe involved in the accident. He testified that the rear wheels had protective covers over the tone rings that would have prevented the subject accident. Miller testified further about other cars he had worked on that had such protective covers. Hyundai stipulated to the feasibility of alternative designs. No additional expertise beyond that possessed by an experienced automobile mechanic trained in ABS repair was necessary to reach what was a rather obvious conclusion—that if the tone ring in question had been protected by a cover like the ones on the vehicle's rear wheels, the series of events described by Hutton could not have occurred. The trial court was within its discretion in finding Miller qualified to render his expert opinions.

¶82. Further, the trial court did not abuse its discretion by finding that Miller's testimony was reliable. The majority finds that "Miller's testimony was wholly speculative and contradicted facts in the record." Maj. Op. ¶ 50. But all of the facts relied on by the majority

39

that supposedly establish the unreliability of Miller's testimony were, in reality, disputed evidentiary matters. First, the majority finds that a photograph taken by a state trooper after the accident showed that the tone ring was in place and that no marks appeared on the lower control arm. The majority says that this conflicted with Miller's photograph, taken six years after the accident, that showed the gouge marks and a dislodged tone ring. If that were true, the photograph would be strong evidence tending disprove Hutton's theory that the displaced tone ring caused the accident. But the matter of the photograph lacks the portent that Hyundai and the majority would like to give it. Miller testified that he first photographed the subject vehicle thirty days after the accident and that he observed the gouge marks at that time. His photographs were admitted into evidence. Hyundai's expert Geoff Germane offered surprise testimony[13] that an enlargement of the trooper's photograph showed no damage to the lower control arm and tone ring after the accident, but Hutton hotly disputed this contention. Clearly, the matter of whether the trooper's photograph disproved Hutton's theory of the case was for the jury to decide, not a factor impacting the admissibility of Miller's testimony. In fact, the photograph was not brought to the attention of the trial court at the time that it made the admissibility ruling.

¶83.    Next, the majority finds that Miller's testimony was unreliable because Hutton's expert in mechanical engineering and metallurgy, John Rinker, testified that the tone ring was "completely displaced" rather than being knocked askew as Miller testified. Maj. Op. ¶ 50. Hyundai avers that, because Miller testified that if the tone ring had been completely

---

[13] Hyundai was allowed to elicit this testimony from Germane although his expert report did not mention his reliance on the photograph, and no supplementation was made.

displaced the ABS would not have functioned and the car would not have pulled to the left during braking, Rinker's testimony that the tone ring was completely displaced when he saw the accident vehicle disproves Miller's theory that the tone ring was not fully displaced during the accident. While Hyundai brought out on cross-examination that Rinker had observed that the tone ring was completely off, he posited that the complete displacement most likely occurred as the vehicle rolled over in the accident. Again, the position of the tone ring at various times was hotly contested and was a matter for the jury's resolution.

¶84. Contrary to the majority's finding, the trial court did not allow Miller to testify in the area of ABS designs. Rather, the trial court found that Miller's expertise and training as an automobile mechanic rendered his testimony helpful to the jury. Miller relied on his training in repairing ABS systems, his experience as a mechanic, Bell's deposition testimony about how the vehicle had behaved before the accident, his observations of the subject vehicle, and his testing of the ABS system with the tone ring askew. Miller testified that he had done hundreds of tests of ABS systems similar to the one he performed in this case. Miller's test methodology was similar to the type of vehicle testing performed by Hyundai's experts who, like Miller, obtained an intact 2005 Hyundai Santa Fe and made various adjustments to the braking system while measuring performance.

¶85. The majority faults Miller for not supplying an opinion supported by treatises or peer-reviewed articles. But none of the experts ever had encountered an accident caused by road debris striking a tone ring or located any peer reviewed articles about such an accident's having occurred. Although Miller did not offer peer reviewed articles tending to prove his

41

theory, the trial court cannot be faulted for not excluding Miller's testimony based on their absence. The United States Supreme Court in ***Kumho Tire***, 526 U.S. at 151, explained that "[i]t might not be surprising that in a particular case, for example, that a claim made by a scientific witness has never been the subject of peer review, for the particular application at issue may not have ever interested any scientist." Although the majority apparently believes that the fact that no record exists of a similar accident renders the testimony of Hutton's experts unreliable, its reasoning would preclude litigants from proving that a particular type of accident had occurred for the first time.

> B.     *Rinker was qualified to testify as an expert in metallurgy and mechanical engineering, and his opinions were reliable.*

¶86.    The trial court accepted John Rinker as an expert in the fields of metallurgy and mechanical engineering. Rinker testified that he is a consulting engineer in metallurgy, failure analysis, and mechanical engineering. He has a bachelor's degree in mechanical engineering, a master of science degree in metallurgy, and a Ph.D. degree in metallurgy. Rinker testified that he studies the fracture and fatigue of metals and performs failure analyses to determine the causes of fatigue, corrosion, and breakage. He explained that as a mechanical engineer he evaluates designs in a variety of areas. Rinker testified that he had never designed an ABS and had not performed a formal accident reconstruction in this case. But he testified that he does not need to design a system to be able to ascertain why such a system failed. He testified that he has determined the reasons for failure of aircraft structural components and medical equipment, as well as wheel hubs and brakes.

42

¶87. Rinker testified that he was asked to examine the 2005 Santa Fe and the gouge marks associated with the tone ring and to determine the meaning of those marks. He said that he examined the subject vehicle on two occasions and participated in Miller's testing. He testified that, when objects bump together, marks left behind are called witness marks. He testified that witness marks on the 2005 Santa Fe told a story of a dislodged tone ring. Rinker testified to a reasonable degree of scientific certainty that the area had come in contact with a foreign object, probably metal, that dislodged the tone ring. He pointed out a scar mark on the CV joint housing from contact with a foreign object. Rinker opined that the object had come into contact with the underside of the vehicle while the wheel was turning. Among the several witness marks that he testified about, he observed a gouge mark extending underneath the area where the tone ring was supposed to be. Rinker explained that this mark showed that an object had knocked the tone ring out of place. According to Rinker, the photographs that Miller had taken thirty days after the accident showed the same marks that he later observed. Also, those photographs showed that the tone ring was dislodged. Rinker was unable to describe the size and shape of the piece of metal that he opined had caused the damage, but he testified that, due to the trail of witness marks, he did not need the object. He testified that he had not done any calculations or a cost analysis of alternative designs but that he relied instead on his metallurgical and mechanical engineering expertise to opine on the path of the debris. Rinker testified also that the alternative designs identified by Miller in which the tone ring was completely enclosed would not have allowed the ring's displacement by a foreign object. He corroborated Miller's observations of how the examplar 2005 Santa

43

Fe had behaved during testing.

¶88. I find that the trial court was within its discretion in finding that Rinker's opinions were within his expertise as a metallurgist and mechanical engineer. The majority finds that the trial court erred because Rinker had never designed an ABS, performed design work for an automobile manufacturer, did not rely on peer reviewed articles addressing a similar accident, and had not been qualified in a case involving a tone ring. Respectfully, the majority insists on an impossibly exact fit between the facts of this case and the experts that it would find qualified to testify about them. The majority errs by requiring that an accident of this precise kind have occurred previously to enable its documentation in peer reviewed articles. But Rinker was qualified to testify about the nature of the witness marks by virtue of his qualifications as a mechanical engineer and a metallurgist and his experience evaluating the causes of material fatigue. His testimony about alternative designs mirrored Miller's and, as a mechanical engineer, he was even more qualified to opine that, had a protective cover been present over the 2005 Santa Fe's tone ring, a foreign object could not have struck the tone ring. Given *Daubert*'s flexibility, a mechanical engineer such as Rinker, who understood the workings of an ABS, need not actually have designed an ABS to be permitted to provide this sort of testimony. Regarding reliability, Rinker's testimony was based on the application of his metallurgical and mechanical engineering education, expertise, and training to his observations of the witness marks on the 2005 Santa Fe. While Rinker did not perform tests such as a time or directional analysis or calculate kinetic energy as suggested on cross-examination and required by the majority, his testimony indicates that

such tests and calculations were unnecessary for him to provide reliable opinions in this case.

I find no error in the admission of Rinker's testimony. I observe that Hyundai aptly challenged the testimony of Hutton's experts with thorough cross-examination and its presentation of four qualified experts who offered testimony countering every point made by Miller and Rinker, down to the most minute detail. Because the expert testimony of both Miller and Rinker was admissible, the decision of which side's experts to believe was for the jury.

## II. The trial court did not err by admitting Hutton's evidence of a subsequent remedial measure.

¶89. Hyundai filed a motion *in limine* under Mississippi Rule of Evidence 407 to prevent Hutton from admitting evidence that, in 2008, Hyundai redesigned its Santa Fe vehicle to include shields that protected the front wheels' tone rings. After a hearing, the trial court denied the motion. The trial court recognized that, under the Mississippi Products Liability Act, Hutton had the burden to prove that a feasible alternative design existed. The trial court found that Hutton sought to admit the 2008 design change to show a feasible alternative design, not for purposes of violating the rule against admitting into evidence proof of subsequent remedial measures. Later, the trial court denied two motions for a mistrial by Hyundai based on the admission of testimony about the 2008 design change.

Mississippi Rule of Evidence 407 provides that

> When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove:
>
> • negligence;

- culpable conduct;

- a defect in a product or its design; or

- a need for a warning or instruction.

But the court may admit this evidence for another purpose, such as impeachment or—if disputed—proving ownership, control, or *the feasibility of precautionary measures*.

MRE 407 (emphasis added). "The rationale underlying Rule 407, which this state adopted from the federal model, 'rests on a social policy of encouraging people to take, or at least not discourag[e] them from taking, steps in furtherance of added safety.'"***Estate of Bloodworth ex rel. Bloodworth v. Ill. Cent. R.R. Co.***, 129 So. 3d 888, 901 (Miss. 2013) (quoting FRE 407 advisory comm. n.). Notably, the rule contains an exception allowing the admission of subsequent measures to show "the feasibility of precautionary measures." MRE 407.

¶90. Hyundai posits that, because it stipulated to the feasibility of alternative designs, Hutton's reason for introducing the 2008 design was foreclosed and the only reason Hutton presented evidence concerning the 2008 design was to show Hyundai's negligence, which violated Rule 407. Hutton introduced evidence of the 2008 design during Miller's testimony. He testified that manufacturers were "going toward the design of the 2008 . . . ." Miller testified about other vehicles that had a design covering the tone rings, including a 2002 Ford F-150 pickup and a 2000 Chevrolet Impala. Hyundai complains about Miller's testimony about the 2008 design and that "[m]odels of the axle/wheel-hub assemblies for the 2005 and 2008 Santa Fes sat in front of the jury for the entirety of the two-week trial . . . ."

¶91. I would hold that the trial court was within its discretion in ruling that the 2008 design

change was admissible to show the feasibility of an alternative design. Hutton and Bell were required to prove feasibility as an element of their claim. For a defective design claim under the Mississippi Products Liability Act, the plaintiff must show that

> [t]he product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

Miss. Code Ann. § 11-1-63(f)(ii) (Rev. 2019). "If an alternative design could have been practically adopted at the time of sale, and if the omission of such an alternative design rendered the product not reasonably safe, then a design is defective." ***Williams v. Bennett***, 921 So. 2d 1269, 1275 (Miss. 2006) (citing Restatement (Third) of Torts: Products Liability § 2 (Am. L. Inst. 1998)). Miller's testimony about the 2008 design tended to show in combination with other testimony that a feasible alternative design existed. Hyundai argued at trial and argues before this Court that Hutton had no need to submit evidence establishing feasibility because Hyundai had stipulated to feasibility in a pretrial order that was signed by both parties. But that argument is disingenuous. In the pretrial order, the parties indeed stipulated that "[t]he feasibility of alternative designs is not disputed." The next page of the order set forth "[t]he contested issues of fact," including "[w]hether or not in the year 2005 and prior thereto, it was engineeringly feasible to utilize the design of the 2008 right front ABS system design, which was utilized in the year model 2008." Therefore, Hyundai agreed that the feasibility of the 2008 design was an issue for trial in the pretrial order signed by counsel for all parties. Moreover, the United States Court of Appeals for the Fifth Circuit has

said that a defendant's stipulation to feasibility alone does relieve the plaintiff from showing "that the alternative designs do not impair the 'utility, usefulness, practicability or desirability of the product to users or consumers.'" *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 993 (5th Cir. 1997) (citing Miss. Code Ann. § 11-1-63(f)(ii)). I would hold that this issue does not entitle Hyundai to a new trial.

### III. The trial court's limiting of Hyundai's cross-examination of Hutton about having sued Bell was not reversible error.

¶92. The trial court granted Hutton's motion *in limine* to prevent Hyundai from mentioning that Hutton initially had sued Bell. The trial court prohibited any mention of Hutton's settlement with Bell and prevented Hyundai from asking Hutton about her having sued Bell. The trial court reasoned that mentioning Hutton's lawsuit against Bell would leave the jury to "speculate that the matter came to a conclusion by some agreement or that the lawsuit was settled."

¶93. This issue implicates Mississippi Rule of Evidence 408, which provides:

(a) **Prohibited Uses.** Evidence of the following is not admissible either to prove or disprove the validity or amount of a disputed claim:

(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim; and

(2) conduct or a statement made during compromise negotiations about the claim.

(b) **Exceptions.**

(1) The court may admit this evidence for another purpose, such as proving a witness's bias or prejudice, negating a contention of undue delay, or

48

> proving an effort to obstruct a criminal investigation or prosecution.

>   **(2)**     This rule does not apply to otherwise discoverable evidence presented during compromise negotiations.

MRE 408.

¶94.    The majority finds that the trial court erred by preventing Hyundai from cross-examining Hutton about her having claimed at the outset of the litigation that Bell was at fault for the accident. It relies on *Smith v. Payne*, 839 So. 2d 482, 487 (Miss. 2002), in which this Court held that a jury charged with apportioning fault among joint tortfeasors under Mississippi Code Section 85-5-7(5) (Rev. 2011) is entitled to know that a plaintiff initially claimed another tortfeasor was at fault before settling with that individual. But in *Smith* we found that no reversible error resulted from informing the jury of the prior lawsuit. *Smith* did not decide that failure to allow such impeachment is automatic reversible error.

¶95.    For reversible error to arise from a ruling excluding evidence, the error must have affected a party's substantial right. MRE 103. Hyundai argues that it should have been able to question Hutton about whether she had sued Bell. Further, Hyundai argues that the trial court should not have sustained Hutton and Bell's objection to Hyundai's asking Hutton, "It's true that after this accident, you claimed that Derek Bell caused this crash?" I would find that any error from precluding Hyundai's impeachment of Hutton on this point was harmless in light of the negligible prejudice suffered by Hyundai. Throughout the trial, Hyundai sought to show that Bell was at fault for causing the accident by losing control of the vehicle. During opening statements, Hyundai informed the jury that Hutton had claimed that Bell was at fault and that she had sued Bell. Hyundai showed the jury a Power Point

presentation saying that Hutton had sued Bell. Although opening statements are not evidence, the jury was presented with copious evidence supporting Hyundai's theory that Bell should be apportioned some or all of the fault. During the ten-day trial, Hyundai's experts propounded various theories that the accident was not due to a design defect but rather had been caused by the negligence of Bell. Given that state of affairs, the absence of Hutton's answers to Hyundai's questions about whether she initially had blamed Bell for the accident cannot be said to have resulted in prejudice sufficient to warrant reversal.

### *Conclusion*

¶96.    Our judicial system entrusts to the jury, not to this Court, the task of determining the winner of a battle of experts. That division of labor demands that we be mindful about ensuring that we do not exceed our role. Our job under Rule 702 is limited to ascertaining that the trial court adequately performed its gatekeeping duty to prevent junk science from being presented to the jury. I am confident that the trial court did not abuse its discretion by admitting Hutton's expert testimony. By making mountains out of molehills regarding the expert testimony in this case and by imposing overly stringent requirements on Hutton's experts, the majority unfairly deprives Hutton and Bell of their ability to recover for their injuries. The record evinces that Hyundai received a fair trial. It has not shown reversible error in any aspect of the proceedings. I would affirm.

**KING, P.J., JOINS THIS OPINION.**

**KING, PRESIDING JUSTICE, DISSENTING:**

¶97.    I agree with Presiding Justice Kitchens's dissent that the plaintiffs' experts were

properly allowed to testify and that the jury verdict should be affirmed.  I write separately to express my concerns regarding the majority's expositions on the jury venire selection process.

¶98.   First, this Court acknowledges both that Hyundai waived the jury venire issue by failing to timely raise it and that the issue is moot, yet it decides to address it.  It is inappropriate for the Court to address this issue.  The majority does not and cannot allege that this procedure is still occurring or will ever occur again.  If this procedure is no longer occurring and thus no longer allegedly harming the public, we cannot justify using the public interest exception to the mootness doctrine.  The procedures at issue occurred in 2014, approximately seven years ago, under the supervision of Judge Walls.  Judge Walls retired in early 2016.

 https://courts.ms.gov/news/2016/04.20.16Judge%20Linda%20Coleman%20investiture.php (last visited Aug. 25, 2021).  The majority offers no evidence that similar procedures are currently occurring or that any of the current judges of the Bolivar County Circuit Court utilize such procedures.

¶99.   This Court has previously declined to utilize the public interest exception in a case in which the party responsible for decisions changed.  *Lafayette Cnty. Bd. of Supervisors v. Third Cir. Drug Ct.*, 80 So. 3d 785 (Miss. 2012).  The Court noted that after the drug court's "lead county" changed from Lafayette County to Union County, "there is no present harm readily apparent (or even alleged) to either the drug court or to Lafayette County or to the public."  *Id.* at 788 (internal quotation marks omitted).  Similarly, in this case, seven years

51

later and with a change in judges, no present harm to the public is readily apparent or alleged. This Court should not address an issue that it has no evidence even exists.

¶100. Further, the majority writes at length to address a moot and waived issue because of its expressed belief that the right to a fair jury is so inviolate as to justify the public interest exception. I, too, believe that the right to a fair jury is inviolate. But I urge the majority to be consistent, rather than situational, in its recognition, embrace, and application of the inviolability of the right to a fair jury.

¶101. Second, the majority uses an underdeveloped record to conclude that Bolivar County is violating the jury selection statutes. While it may be the case that Bolivar County is doing so, when examining the incomplete record on this issue, the statutes, and the caselaw, this Court simply cannot in good faith and with fidelity to the law reach that conclusion.

¶102. The record in this case is simply not sufficiently developed to determine that Bolivar County failed to comply with the requirement that a judge make the decision regarding hardship exemptions. Hyundai faults lack of compliance at least partially on a court administrator allegedly excusing jurors. Yet, a court administrator works for a judge in assisting the judge to carry out his or her duties. The record is devoid of why or how the court administrator was excusing jurors. Was she doing so in consultation with the judge? Did the judge delegate that duty to her? Or did she, as seemingly alleged, unilaterally determine that the duty to excuse jurors should be hers and began acting without authority of the judge for whom she worked? The majority faults the court administrator and the trial judge for failing to voluntarily offer how or why this process occurred. Yet, it was Hyundai's

burden to ask those questions. The majority also relies on a misconstruction of the court administrator's testimony. She did not testify that she dealt with the decision-making. The attorney for Hyundai asked her in a not entirely clear question, "And so they would get to you to deal with in the decision-making, and you turn it back to the clerk?" and she answered "Yes, sir." Again, no questions were asked regarding the specifics of how or why the court administrator was to "deal with" jury exemptions "in the decision-making."

¶103. This Court has noted that following the juror exemption statutes literally is not necessary when doing so is impracticable. *Parker v. State*, 201 Miss. 579, 29 So. 2d 910, 912 (1947). Furthermore, the jury selection statutes are directory, not mandatory. *Thomas v. State*, 818 So. 2d 335, 340 (Miss. 2002). The majority, while admitting that the statutes are directory, nonetheless argues that Section 13-5-23(2) and (3) are absolutely mandatory. Maj. Op. ¶ 66. Yet, in wise and prudent orders issued by the Chief Justice of this Court to address the COVID-19 pandemic and to protect the public health, this Court has recognized that, when impracticable, the statutes are not absolutely mandatory. For example, the Court ordered that "[j]urors who are ill, caring for someone who is ill, or in a high risk category *shall* have their jury service postponed to a later date." Emergency Administrative Order-5, No. 2020-AD-00001-SCT (Miss. Mar. 20, 2020). The Court also required jurors who travel to areas with high rates of COVID-19 transmission to contact the court, despite such a requirement or exemption being absent from the statute. Emergency Administrative Order, No. 2020-AD-00001-SCT (Miss. Mar. 13, 2020).

¶104. I offer no opinion regarding whether any such delegation or consultation as may or

53

may not have occurred here would comply with or violate the jury exemption statutes. But certainly, if such is the case, it adds layers of analysis to the equation. And because the record is not developed regarding these facts, and because the record does not reflect that the court administrator unilaterally seized this duty, this Court should not decide whether this situation complies with the statutes.

¶105. As a side note, while the majority cites Hyundai's arguments that males and the employed were not proportionally represented in the jury venire, a jury venire need not exactly mirror community composition. *See **Thomas***, 818 So. 2d at 340-42. Furthermore, to show that the jury venire did not represent a fair cross-section of the community, a party must first establish that the group unfairly excluded is a "distinctive group." ***Id.*** at 341 (quoting ***Duren v. Missouri***, 439 U.S. 357, 364, 99 S. Ct. 664, 58 L. Ed. 2d 579 (1979)). Hyundai offers no caselaw that demonstrates that the employed are a distinctive group.

¶106. Because the issue is waived, moot, and relies on an underdeveloped record, this Court should not address the jury venire issue. Furthermore, in doing so, the majority relies on facts not in evidence to come to an inappropriate conclusion. Accordingly, and for the reasons stated in Presiding Justice Kitchens's opinion, I dissent.

**KITCHENS, P.J., JOINS THIS OPINION.**